GORDON W. EGAN (SBN 111470)
SIGNATURE LAW GROUP LLP
3400 Bradshaw Road, Suite A4-A
Sacramento, CA  95827
Telephone:  (916) 362-2660
Fax:  (916) 880-5255
gegan@signaturelawgroup.com

Attorney for Plaintiff
California Nevada Annual
Conference of the United Methodist Church

# UNTIED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIA-NEVADA ANNUAL CONFERENCE OF THE UNITED METHODIST CHURCH, a California religious corporation,<br><br>                    Plaintiff,<br><br>v.<br><br>CITY AND COUNTY OF SAN FRANCISCO, a chartered California city and county; and DOES 1-100, inclusive,<br><br>                    Defendants. | CASE NO.:   CV  11- 2338 DMR<br><br>COMPLAINT FOR<br><br>1.  VIOLATION OF CONSTITUTIONAL RIGHTS AND THE RELIGIOUS LAND USE AND INSTITUTIONALIZED PERSONS ACT [42 U.S.C. 1983; 42 U.S.C. 2000cc]<br><br>2.  INVERSE CONDEMNATION<br><br>AND<br><br>DEMAND FOR JURY TRIAL |

1

**Cal-Nev Annual Conference UMC vs. City and County of San Francisco -- Complaint**

Plaintiff, California-Nevada Annual Conference of the Methodist Church, a California religious corporation, for causes of action against defendants, and each of them, alleges as follows:

## NATURE OF ACTION

1.     The Plaintiff, the California-Nevada Annual Conference of the Methodist Church, a California religious corporation, (hereinafter the "Conference" or "Plaintiff"), brings this action to redress injuries caused by the Defendant's unlawful restrictions on the Plaintiff's use of its church building at 1601 Larkin Street, San Francisco, California. The Conference's building is clearly functionally obsolete and structurally deficient to the extent that it cannot be safely occupied. This prevents the Conference and members of its constituent congregations from engaging in religious activities motivated by their sincere beliefs. The congregation that occupied the church building has merged with another and the Conference seeks to demolish the structure, sell the land and use the proceeds to further the Methodist religious mission in San Francisco.

2.      The City and County of San Francisco; San Francisco Historic Preservation Commission (formally the San Francisco Landmark Preservation Advisory Board); City and County of San Francisco Board of Supervisors; City and County of San Francisco Planning Commission; San Francisco Planning Department; San Francisco Department Of Building Inspection, (hereinafter collectively the "City" or "Defendant"), however, has illegally attempted to designate the building as a historic landmark, delayed, and ultimately denied, the Conference's application for a demolition permit substantially burdening the Conference's free exercise of its religion.

3.      Plaintiff alleges that the City's actions violate the First Amendment of the United States Constitution, the Religious Land Use and Institutionalized Persons Act of 2000, 42 U.S.C. § 2000cc *et seq.* (hereinafter "RLUIPA") and the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb *et seq.* (hereinafter "RFRA") by substantially burdening the Conference's religious exercise without a compelling governmental interest. Plaintiff further alleges that the

2

**Cal-Nev Annual Conference UMC vs. City and County of San Francisco -- Complaint**

Defendant's actions constitute a taking of the Plaintiff's property and deprive Plaintiff of due process.

4.      Plaintiff seeks declaratory and injunctive relief under RLUIPA, RFRA, 42 U.S.C.§ 1983 and the United States Constitution for injuries suffered as a result of Defendants' unlawful conduct. Plaintiff also seeks damages, costs and attorneys fees.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over all federal claims in the Complaint as arising under the United States Constitution pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3) and (a)(4), and under 42 U.S.C. § 2000cc *et seq.*, which confers original jurisdiction on United States District Courts in suits to redress the deprivation of rights, privileges and immunities, as stated herein. This Court has jurisdiction over the request for declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202.

## PARTIES

6.      At all times herein mentioned Plaintiff Conference was and is a religious corporation, incorporated under the laws of California, with its principal office in West Sacramento, Yolo County, California. "The purpose of the annual conference is to make disciples of Jesus Christ for the transformation of the world by equipping its local churches for ministry and by providing a connection for ministry beyond the local church; all to the glory of God." Methodist Book of Discipline § 601.

7.      The City and County of San Francisco is a municipal corporation duly organized under the laws of the State of California. The Board of Supervisors of the City and County of San Francisco is the elected legislative body of the City and County of San Francisco.  The San Francisco Planning Commission, an appointed body of the City and County of San Francisco that reviews certain land use and development proposals within the County and County of San Francisco;  the San Francisco Planning Department, a department of the City and County of San Francisco provides staff to the Planning Commission described above;  The San Francisco Department Of Building Inspection, a department of the City and County of San Francisco,

reviews and approves applications for building and demolition permits within the City and County of San Francisco.  The San Francisco Historic Preservation Board is an advisory board to the Board of Supervisors on historic preservation. As used in this complaint, "City" includes the Board of Supervisors, the Planning Commission; the Planning Department, the Department of Building Inspection, and the San Francisco Historic Preservation Board.

**STATEMENT OF FACTS**

8.      Methodism was founded in the 1730s and 40s in England, not as a religion but as a movement, headed by John and Charles Wesley, inside the Anglican Church. It eventually evolved into a separate Christian denomination.

9.      Methodism is the largest mainline Protestant religious denomination in the United States today.  There are currently nine active Methodist congregations in San Francisco. "The mission of the Church is to make disciples of Jesus Christ for the transformation of the world. Local churches provide the most significant arena through which disciple-making occurs."  The Book of Discipline of The United Methodist Church—2008, p. 87.  This is a four-fold task: the church reaches out to people and welcomes them into the church; it relates people to God and help them deepen their relationship with God; it nurtures people in Christian living and it supports people in their ministry.

10.      The United Methodist faith is deeply rooted in the Scripture and in the basic beliefs of all Christians. Out of that theology and the faith have grown some specific actions that mark United Methodists as Christians engaged in ministry to the world. The early members of the groups that eventually became The United Methodist Church:

•      took strong stands on issues such as slavery, smuggling, and humane treatment of prisoners;

•      established institutions for higher learning;

•      started hospitals and shelters for children and the elderly;

•      founded Goodwill Industries in 1902;

•      became actively involved in efforts for world peace;

4

**Cal-Nev Annual Conference UMC vs. City and County of San Francisco -- Complaint**

•     adopted a Social Creed and Social Principles to guide them as they relate to God's world and God's people;

•     participated with other religious groups in ecumenical efforts to be in mission.

11.     Methodists and the Methodist Church venerate and celebrate their history and the history of the Wesleyan movement. ."  The Book of Discipline of The United Methodist Church—2008. But Methodists do not sanctify or celebrate buildings or places, indeed the Doctrinal Standards warn against the adoration or worshiping of things.  Methodists venerate their congregations, their lay leaders, their ideas and their faith, not churches.

12.     Methodists believe buildings are just one of the assets God has provided them to accomplish their mission, and are to be treated like any other asset, recycled and reused when they have reached the end of their useful life. Setting aside an asset which could be used for its religious mission solely to venerate it for historical purposes is contrary to Methodist doctrine.

13.     Methodists first organized in San Francisco in 1847.  By the end of the 1850's the congregation was occupying a permanent church at Washington and Powell Streets. This "First Methodist Church" remained here until the building was destroyed in the 1906 earthquake and fire.  After the earthquake and fire, the congregation purchased property at 1601 Larkin Street, at southwest the corner of Clay and Larkin and erected a temporary church.  Some of the congregation rebuilt the building at Washington and Powell.

14.     The 1601 Larkin property, while constructed by an offshoot of the original Methodist congregation in San Francisco, is not the original building, nor the original site. Moreover, many of the historic figures in early California Methodism were deceased at the time of the earthquake and have no connection to 1601 Larkin.

15.     Additionally, the San Francisco institutions that San Franciscan's most associate with Methodism, Glide Memorial and Bethany United Methodist Church are associated with neither 1601 Larkin nor the Congregation.  Bethany was founded in 1852, constructed a Church building in the Mission District in 1882 and, consistent with the mission of Methodism, tore that building down and replaced it with senior housing in 1968.

5

**Cal-Nev Annual Conference UMC vs. City and County of San Francisco -- Complaint**

16.     The group that purchased the 1601 Larkin property in 1907, the "Congregation", hired George W. Kramer as the architect. Kramer designed thousands of Protestant churches in his career spanning the 1880s to the 1920s. They are found in abundance throughout the United States, with at least five in California, one of which is still in use. The Congregation had Kramer design a church based on a variation of the "Akron Plan." A "combination church" which essentially has the sanctuary as one large room and a "recreation or Sunday School" room next door with large movable wall separating them. While Kramer did not invent the Akron Plan or the combination church he was one of its major proponents.

17.     In 1911, using Kramer's combination church design the Congregation constructed a wood frame church building on the site and at Clay and Larkin (the "Property"). The Congregation at Clay and Larkin grew and had its largest membership in the 1930s and 1940s. However, the Property was surrounded by apartments and had only four off-street parking places. It was not hospitable to families. By the 1970's the congregation was small. By 2000 it was down to 8 members.

18.     When the church building on the Property was built, almost exactly a hundred years ago, there were minimal, if any, seismic standards. The foundation walls are made of concrete with no reinforcement steel. The building is wood frame construction with no steel supports for large areas. There is no waterproof membrane behind the stucco finish. By 2002, the building was showing serious effects of deficient materials and age.

19.     The Conference met with the members of the congregation in 2002 and 2003 and installed a group of seminarians from the Pacific School of Religion to revive the Congregation. In spite of their months of spirited work they were unable to overcome years of deferred maintenance, a one hundred year old functionally obsolete building, lack of parking or convenient public transportation, lack of Protestant families in the neighborhood, the changing demographics of San Francisco as a whole, and the overall membership decline of mainstream Protestant religions.

20.     The Conference met with the Congregation again and in a series of meetings cumulating in a "Charge Conference" on October 28, 2003, where the Congregation decided to

6

Cal-Nev Annual Conference UMC vs. City and County of San Francisco -- Complaint

merge with the Park Presidio congregation, turn the building over to the Conference to sell and hold the proceeds to be used to develop a new congregation, new ministry initiative or other congregational development in San Francisco.  This charge is set forth in a letter, a report and memorandum, true and correct copies of which are attached hereto and made a part hereof as Exhibit A.

21.     On or about March 15, 2004, the Congregation transferred legal title to the Property to the Conference to facilitate the sale to a third party.

22.     Subsequent to the charge conference the Conference began talking with real estate agents and others about the sale of the Property.  Several developers expressed interest in purchasing the Property and developing housing.  No one contacted the Conference with any sort of proposal to preserve the building.

23.     In a desire to accomplish the goals of the charge conference and fulfill the Methodists social justice ministry the Conference explored sale of the Property to a low income housing developer. However, the agency, which proposed demolishing  the existing structure and replacing it with an entirely new structure, was unwilling to pay anywhere near the market price for the Property, and the Conference felt that its duty as a good steward of the Conference assets did not permit a sale at such a steep discount.

24.     In mid-2004, the Conference entered into a contract to sell the Property to Pacific Polk Properties, LLC, ("Pacific Polk") to develop the Property as a condominium project.  Once a demolition permit is issued and the Property is demolished, the Conference stands to gain $3,000,000 from this sale which will be used for the mission of the Church as stated above.

25.     The Conference spends over $30,000.00 annually maintaining the Property.  These expenses include insurance premiums, maintenance, property taxes, and repairs.

26.     A registered professional engineer, Patrick Buscovich ("Buscovich"), performed inspections of the Property in May 2004 and December 2005 and concluded that as it was currently being used, the Property "fails to address reasonable life safety precautions for fire or earthquake."  At the time of the May 2004 report, the Property's only use was as a daycare/pre-school for children.  Buscovich recommended that the daycare/pre-school be closed, explaining

7

**Cal-Nev Annual Conference UMC vs. City and County of San Francisco -- Complaint**

that, "In my opinion this building, regardless of possible code loopholes is unsafe for occupancy and needs significant seismic retrofitting to be used for day care."  Shortly thereafter the daycare/pre-school vacated. A true and correct copy of the Buscovich Report is attached hereto and made a part hereof as Exhibit B.

27.     Not safe enough to occupy, but—according to the City—not dangerous enough to be demolished, the Property has now stood entirely vacant for nearly seven years.  In June 2010 the property was re-inspected by three (3) structural engineers, including Buscovich, who determined the massive dry rot which had been discovered over the preceding several years was due to faulty building methods, namely the failure to include a vapor membrane between the porous exterior stucco and the internal wood framing.  No evidence in the record contradicts any of these findings.

28.     On June 15, 2004, the Conference and Pacific Polk filed environmental evaluation, conditional use, and variance applications with the Planning Department to obtain permission to raze the Property and build a multi-family residential project designed by internationally acclaimed architect Stanley Saitowitz. The Planning Department collected a filing fee of $58,900.56 for these applications.  Later in 2004, the Conference and Pacific Polk also applied for demolition and new construction permits. The Building Department collected a filing fee of $37,755.35 for these applications.

29.     On March 22, 2005 the Planning Department stated that "the determination of the Environmental Review Officer is that an environmental impact report (EIR) will need to be prepared for the project," and was accompanied by the February 22, 2005 determination of the Planning Department that "the project is to demolish the existing church and to construct a … residential building…."   The Planning Department collected a fee of $50,098 for the EIR, and then required the Conference and Pacific Polk to hire an outside consultant nearly $200,000 at their expense to prepare the EIR under the Planning Department's supervision and direction. A draft environmental impact report ("DEIR") was published on April 14, 2007 and the Landmarks Preservation Advisory Board conducted a public information hearing on the DEIR on May 16, 2007.

8

**Cal-Nev Annual Conference UMC vs. City and County of San Francisco -- Complaint**

30.       The Planning Department would take no further action on the Conference's requested entitlements and demolition permit for three years.

31.       On May 21, 2007, three years after the development project began, and after hundreds of thousands of dollars were expended upon processing the project, the Land Use and Economic Development Committee of the San Francisco Board of Supervisors held a hearing, entertaining for the first time a resolution introduced by Supervisor Peskin on May 8, 2007, to designate the Property as a "landmark."  The Conference strenuously objected to such designation.  First, in a letter dated May 21,2007 the Conference's attorneys explained how the actions of the Board of Supervisors clearly violate the Religious Land Use and Incarcerated Persons Act, 42 USC §2000cc (RLUIPA). A true and correct copy of the Conference's letter is attached hereto and made a part hereof as Exhibit C.  Second, the Conference formally noticed its objection to the landmarking. A true and correct copy of the Conference's objection is attached hereto and made a part hereof as Exhibit D.  Finally, in a letter to the Board of Supervisors from its Director of Administrative Services, the Conference explained the situation and objected that the entire process violates California's Government Code prohibition on landmarking of church buildings over the objections of the church (*See* Cal. Gov't Code §§ 25373(d), 37361(c); *see also E. Bay Asian Local Dev. Corp. v. State of California,* 24 Cal. 4th 693, 702 (2000) A true and correct copy of the Conference's letter regarding landmarking is attached hereto and made a part hereof as Exhibit E. The Conference also appeared at the hearing and orally objected.  The resolution passed.

32.       On June 5, 2007, the resolution went before the full Board of Supervisors where the resolution was adopted.  A true and correct copy of the Board of Supervisor's Resolution is attached hereto and made a part hereof as Exhibit F.  While this did not actually designate the Property as a landmark, it did refer the matter to the City of San Francisco Historic Preservation Board for further study.  It also stopped all processing of the land use entitlements and demolition permit.

33.       On August 10, 2007, the Conference, along with Pacific Polk, filed a Petition for Writ of Mandate in San Francisco Superior Court.  Based on Cal. Gov't Code §§ 25373(d) and

9

**Cal-Nev Annual Conference UMC vs. City and County of San Francisco -- Complaint**

37361(c), the petition requested issuance of a writ of Mandate ordering the City to cease its proceedings to landmark the Property.

34.     Even though the Conference had a pending mandate action, the City continued ignoring the pending entitlement applications in its relentless march towards landmarking the Property.  To that end on August 15, 2007, the City's Landmark's Preservation Advisory Board, refused to continue their hearing pending resolution of the Conference's legal action and the written and oral protests of the Conference, and recommended to the San Francisco Planning Commission that it approve designation of the Property as a Landmark.

35.     At a Planning Commission hearing of September 20, 2007, with the mandate action pending, the Planning Commission recommended to the Board of Supervisors that the Property be designated a Landmark.  They made this decision after limiting testimony on the matter and brushing aside the oral and written protests of the Conference. A true and correct copy of the Planning Commission's decision is attached hereto and made a part hereof as Exhibit G.

36.     On May 6, 2008, the Superior Court rendered its Statement of Decision in favor of the Conference and issued a Peremptory Writ of Mandate compelling the City to halt its Land marking proceedings.  A true and correct copy of the Superior Court's Statement of Decision is attached hereto and made a part hereof as Exhibit H; and a true and correct copy of the Superior Court's Writ is attached hereto and made a part hereof as Exhibit I. The Court found that the City was acting in excess of its jurisdiction in seeking to landmark the Property, in violation of Cal. Gov't Code §§ 25373(d) and 37361(c).

37.     Despite the fact there was a writ issued against it, the City refused to process the Conference and Pacific Polk's demolition permit and entitlement applications.

38.     The City appealed and lost.  On May 20, 2009, the Court of Appeal unanimously affirmed the trial court decision, holding in a published decision that "in seeking to landmark the Property, the City acted "unquestionably  . . . beyond [its] jurisdiction."  *Cal.-Nev. Annual Conference of United Methodist Church v. San Francisco*, 173 Cal. App. 4th 1559, 1571 (2009).

10

**Cal-Nev Annual Conference UMC vs. City and County of San Francisco -- Complaint**

39.     One year later, on May 27, 2010, and nearly six (6) years after the application for the Conditional Use Permit and Demolition Permit was filed in 2004, the Planning Department published the Comments and Responses Final Environmental Impact Report ("FEIR"), and caused notice to be given of a hearing on the document before the Planning Commission on June 24, 2010.

40.     The Planning Department also noticed a hearing at the Planning Commission on the Conditional Use Permit (and apparently on the Demolition Permit) for June 24, 2010.  These were scheduled as consecutive hearings on the Planning Commission agenda.

41.     The Conference and Pacific Polk's historical consultant in preparing the EIR had determined that the church building was not an historical resource.  City staff reversed that conclusion and required Pacific Polk to come up with two alternatives that would preserve some part of the structure.

42.     California's Environmental Quality Act ("CEQA") requires that an environmental impact report ("EIR") need not study all possible alternatives to a project ,only reasonable alternates.

43.     Pacific Polk's EIR consultant presented two alternatives, a conversion of the church to condominiums with construction of a annex in the parking lot and construction of the planned condominium project while preserving the church tower.

44.     The Conference, concerned that the City was attempting to force it and Pacific Polk to agree to some adaptive reuse of the Property that would gut the building of value and prevent or preclude the Conference to use the property to support its mission in San Francisco insofar as no reasonable preservation alternative exists due to the deteriorated condition of the building, engaged three different structural engineers to review the building prior to the hearing and provide their expert input on the structure.

45.     Patrick Buscovich, who inspected the building in 2004 and 2005, re-inspected the building on June 7, 2010.  This time portions of the stucco had been removed to facilitate inspection of the underlying structure.  He found that approximately 50% of the exterior wood wall framing will require replacement and that all building stucco and 20% of the interior wall

11

finished must be removed to accommodate this remediation work. He opined that the cause of this wood rot was Kramer's original design apparently did not contain a moisture barrier protecting the wood structure. He also found that the building's bell tower was so deteriorated that it posed an immediate life safety hazard. A true and correct copy of Patrick Buscovich's report of June 15, 2010 is attached hereto as Exhibit J.

46.     On June 2, 2010, Albert Urrutia, a structural engineer with Santos and Urrutia also inspected the building. A true and correct copy of his report of June 15, 2010 is attached hereto as Exhibit K. He concludes the primary avenue for water infiltration causing the extensive dry rot to be failure of the stucco. He finds areas of dry rot around windows that appear to him to be because of failed connections between the stucco and stucco molding. He attributes the stucco failure in the tower to be the result of two gabled roof sections. He attributes the failure of the stucco not to deferred maintenance but of the deficiencies in the original design of the building. He also examined the foundation system and while he determined it to be in serviceable condition he found: " in our professional opinion it is inadequate for a structure with such a high occupant load. Further this foundation system would not support seismic retrofit work for a building of this size and mass." He found the lack of any lateral bracing system a significant deficiency   He also recommends removal of all stucco and construction of three story tall steel moment frames to stiffen the structure. Finally, he too was concerned that that the wood framing is severely rotted in the tower which could lead to the structural collapse of the tower and destruction of the building.

47.     Also on June 2, 2010 structural engineer Diarmuid Mac Neill of Dolmen Structural Engineers, Inc., inspected the building. Dolemn are experienced seismic retrofit engineers in San Francisco. MacNeill was asked for an opinion as to "whether parts of the existing building could be preserved and incorporated into the new structure." He determined that "Modern stucco detailing includes heavy papering and weep screeds that allow water to exit the stucco. At the time this stucco was applied those details were not were not standard practice and the result is that the frame has rotted to an alarming extent. Rotting of the tower is

12

particularly dramatic. . . . .   Obviously no part of the timber frame is salvageable." A true and correct copy of his report of June 3, 2010 is attached hereto as Exhibit L.

48.      In light of the reports of the structural engineers it became clear that no reuse of the existing structure was possible without essentially rebuilding it from scratch.  No experts have ever rebutted these structural engineering reports in any reports to the Planning Department or its staff, or hearings before the Planning Commission or Board of Supervisors.

49.      The Planning Department recommended to the Planning Commission prior to the hearing that the Final Environmental Impact Report with comments be certified as complete. The Planning department felt it complied with all requirements of the California Environmental Quality Act. A true and correct copy of their draft motion certifying the Final Environmental Impact Report is attached hereto as Exhibit M.

50.      The Planning Department's memorandum to the Planning Commission further recommended that Pacific' Polk's actual project be denied or delayed because the project would result in an abrupt change in scale from existing buildings, the massing of the project is not sculpted to appropriately transition to adjacent lower buildings, the project does not break the apparent scale of the building into discrete elements, the project would result in the demolition of an historic resource, and the project is not desirable for or compatible with the surrounding neighborhood. A true and correct copy of his memorandum dated June 18, 2010 is attached hereto as Exhibit N.

51.      In light of the negative recommendation on Conditional Use permit application and concerns expressed by some Planning Commissioners prior to the Commission meeting, Pacific Polk and the Conference requested a continuance on both hearings, FEIR and Conditional Use, to modify the design to resolve the design issues.  In spite of the fact that continuances of this sort are routinely requested and regularly granted and the City had refused to schedule this hearing for more than three years while they pursued a litigation strategy to vindicate acts that a unanimous Court of Appeal  found "unquestionably  . . . beyond [its] jurisdiction",  the Commission summarily denied the request.

13

**Cal-Nev Annual Conference UMC vs. City and County of San Francisco -- Complaint**

52.     At the CEQA-FEIR hearing, the sole decision before the Commission was whether the FEIR was complete – whether the document contained all of the various discussions it is required to contain pursuant to the California Environmental Quality Act.

53.     After hearing oral testimony, three Commissioners voted that the FEIR was adequate while four voted that it was inadequate and could not be certified because of the document's failure to address alternative uses and aesthetics. No written or oral findings of inadequacy were made or voted upon.

54.     In their oral comments the various commissioners stated that they felt the FEIR did not adequately address alternatives to the project, yet could not and did not specify what those alternatives were.

55.     Instead of sending the EIR back to Planning Staff for further work as is customary, the Commission voted to deny the certification of the FEIR, and then conducted a hearing on the Conditional Use Permit application. A true and correct copy of the Commission's adopted motion is attached hereto and made a part hereof as Exhibit P.

56.     After the FEIR certification was denied, the Commission decided it could not approve the Conditional Use Permit or apparently the Demolition Permit. All it could do was deny or continue the hearing.

57.     The Conditional Use Permit hearing began with Pacific Polk's counsel advising the Commission that the Commission must vote on two aspects of the project, the application for a demolition permit and the application for a building permit.  Notwithstanding the two very different applications—the demolishing of an unsafe church on the one hand, and the construction of a 27-unit condominium complex, on the other—the Commission never treated the Conditional Use Permit application as having two parts.  Instead, the Commission impliedly ruled on the application for a demolition permit as a part of the application to build the proposed 27-unit condominium complex.

58.     The Planning Department recommended that the Commission deny the Conditional Use Permit because of  the project's bulk  and failure to meet the Residential Design Guidelines (Notably, the Planning Department made no mention of, and gave no reasons for

14

**Cal-Nev Annual Conference UMC vs. City and County of San Francisco -- Complaint**

denying, the demolition permit).  The Planning Department only commented on the characteristics of the proposed new condominium complex. The Commission opened the Conditional Use Permit hearing to public comment and discussed the issue amongst themselves.

59.     Three engineers explained to the Commission that the building was structurally deficient and unsafe.

60.      The Commission, like the Planning Department before it, made no mention of, and gave no reasons for denial of the demolition permit.  The Commission only commented on the characteristics of the proposed new condominium complex.  The Commission voted to deny the Conditional Use Permit, including the application for the demolition permit and the application to construct the proposed condominium complex.

61.      In the almost one year since the hearing and the delivery of the engineering reports to the City, the City has consistently refused to authorize demolition of the building nor studied the condition of the building.  The City repeatedly issues citations to the Conference, requiring its attendance at hearings, to force compliance with its demands to maintain and rehabilitate the structure. Contrary to state law, the City has abandoned processing the EIR.  The City has failed to refund any fees paid by Pacific Polk and Plaintiff. The City requested Pacific Polk to prepare a new design. Pacific Polk replaced the original world renowned architect, caused at great expense its new architect to prepare a completely new design which incorporated all of over thirty comments and suggestions of staff, Commissioners, and neighbors, presented the new design to staff which is consistent with designs routinely approved by staff and the Commission, and the staff promptly rejected the design and demanded that it would only consider a design retaining three of the four elevations of the existing, deteriorated building. Apparently, no design will satisfy the City which is intent on preserving the church building irrespective of state or federal laws, or the judgment of state courts.

62.      The actions of the City have had many substantial effects of the ability of the Conference and the various congregations in San Francisco to practice their sincerely held religious beliefs.  Some examples of these effects include, the Conference and congregations have been unable to expand evangelical outreach programs, make needed repairs to buildings to

15

**Cal-Nev Annual Conference UMC vs. City and County of San Francisco -- Complaint**

provide safe places of worship, create new programs to expand Methodism in San Francisco, feed the poor and provide shelter for the homeless.

63.     The fact that California specifically prohibits the landmarking of churches with the idea that such public policy will allow churches to redeploy assets in furtherance of their religious mission with out the second guessing of local government officials has been reaffirmed by the California Supreme Court (*East Bay Asian Local Development Corp. v. State of California* (2000) 24 Cal.4th 693) and twice by California courts of appeal (*California-Nevada Annual Conference etc. v. City and County of San Francisco* (2009) 173 Cal.App.4th 1559 and *Or Khaim Hashalom, v. City Of Santa Monica* (2010) 190 Cal. App. 4th 375); therefore landmarking or adaptive reuse of church structures cannot, as a mater of law, be a compelling interest of the Defendant.

## COUNT I

### Violation of the Religious Land Use and Institutionalized Persons Act of 2000

### "Substantial Burden on Religious Exercise"

### (42 U.S.C. § 2000cc(a))

Paragraphs 1 through 63 are incorporated by reference as if set forth fully herein.

64.     Defendants have deprived and continue to deprive the Conference of its right to the free exercise of religion, as secured by the Religious Land Use and Institutionalized Persons Act, by imposing and implementing a land use regulation that places a substantial burden on the Conference's religious exercise without a compelling governmental interest, and without using the least restrictive means of achieving any such interest.

## COUNT II

### Violation of the Religious Freedom Restoration Act

### (42 U.S.C.A § 2000bb)

65.       Paragraphs 1 through 64 are incorporated by reference as if set forth fully herein.

66.       Defendants have deprived and continue to deprive Plaintiff of its right to the free exercise of religion, as secured by the Religious Freedom Restoration Act, by imposing and implementing a land use regulation that places a substantial burden on Plaintiff's religious exercise without a compelling governmental interest, and without using the least restrictive means of achieving any such interest.

## COUNT III

### Violation of the First Amendment of the United States Constitution

67.       Paragraphs 1 though 66 are incorporated by reference as if set forth fully herein.

68.       Defendants have deprived and continue to deprive Plaintiff of its free exercise of religion, as secured by the First Amendment to the United States Constitution, by substantially burdening Plaintiff's religious exercise without a compelling governmental interest.

## COUNT IV

### Violation of the Fifth Amendment of the United States Constitution
### And Article I, Section 9 of the California Constitution

69.       Paragraphs 1 though 68 are incorporated by reference as if set forth fully herein.

70.       California law and public policy as well and the United States and California Constitutions prohibit the landmarking of church buildings and their sale or demolition free of landmark status to protect the religious mission of the religious institutions

71.       The City intentionally, knowingly and wrongfully prohibited the Conference from demolishing the Property, realizing the proceeds of a sale or other economic use of the Property and thereby prevented the Conference from using its assets to further its religious mission. The Conference notified the Defendant that its acts violated it constitutional and federal statutory rights in 2007.

72.       Today, more than six years after determining that its mission required demolishing the structure and sale to third parties, solely because of the acts of the Defendant,

17

**Cal-Nev Annual Conference UMC vs. City and County of San Francisco -- Complaint**

the Conference remains the owner of an functionally obsolete and uninhabitable building that

cannot be repaired or maintained in any economic sense that has almost no value as is.  It can

neither be sold nor used.  It consumes funds.

73.      The Conference has suffered damages equal to the contract price for the

Property plus interest and carrying costs since June 2007, when the City ceased processing the

demolition permit and other entitlement applications.

## COUNT V

### Regulatory Taking - 42 U.S.C. § 1983

74.      Paragraphs 1 though 73 are incorporated by reference as if set forth fully herein.

75.      The City intentionally, knowingly, and wrongfully deprived the Conference

from demolishing the Property.

76.      The City was acting or purporting to act in the performance of its official duties.

77.      The City's conduct violated Plaintiff's right to property.

78.      The Conference has suffered damages equal to the contract price for the

Property plus interest and carrying costs since June 2007, when the City ceased processing the

demolition permit and other entitlement applications.

79.      The Citys failures are a substantial factor, in fact the only factor, in causing

Plaintiff's harm.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court grant the following relief:

1.      A declaration that the City's action refusing to issue a demolition permit for the

Property is illegal and unconstitutional on the ground that it places a substantial burden on the

Plaintiff's religious exercise without a compelling governmental interest, thereby violating the

Free Exercise Clause of the First Amendment to the United States Constitution, the Religious

Freedom Restoration Act, and the Religious Land Use and Institutionalized Persons Act of 2000;

18

**Cal-Nev Annual Conference UMC vs. City and County of San Francisco -- Complaint**

2.      A preliminary and permanent injunction requiring the Defendants to issue a Demolition Permit to the Conference for the building.

3.      Actual damages equal to the contract price for the Property plus interest and carrying costs since June 2007, plus damages for the temporary taking  and consequential and incidental damages arising therefrom.

4.      An award to Plaintiff of full costs and attorney's fees arising from the Defendants' illegal and unconstitutional actions; and

4.      Such other and further relief as this Court may deem just and appropriate.


## **DEMAND FOR JURY**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff hereby demands a trial by jury in this action of all issues so triable.


DATED May 2, 2011                              SIGNATURE LAW GROUP LLP


                                              _____/ss/ Gordon Egan/ss/_____

                                              Gordon Egan
                                              Attorney for Plaintiff
                                              California-Nevada Annual Conference of the
                                              Methodist Church

19

**Cal-Nev Annual Conference UMC vs. City and County of San Francisco -- Complaint**

# Exhibit A

# FIRST ST. JOHN'S PROPERTY PROCEEDS

October 28, 2003
(First presented June 1, 2003)

The funds deriving from the sale will be deposited in a separate account with the
California-Nevada United Methodist Foundation.  These funds and the accruing interest
will then be made available for developing and building a new congregation, new
ministry initiative, or a congregational development effort in San Francisco.

The funds will be administered by the Conference Board of Missions in consultation with
the San Francisco United Methodist Mission (SUMM), the Golden Gate District
Superintendent and, for three years, a former member of First St. John's UMC.

BOS 00008

Copy

# First St. John's United Methodist Church

1600 Clay Street
San Francisco, CA 94109-3702

Administrative Pastor (415) 567-9020
email <mkwake@mindspring.com

October 6, 2003

Dear Members and Friends:

It has been a good experience for me to have worked with you during these months as your administrative pastor. I have met and worked with some dedicated people who have exemplified the spirit of First St. John's—i.e. seeking to make the gospel of Jesus the Christ a reality in our world. My life has been enriched. October will be my last month as your administrative pastor.

I will work with you to bring closure to our journey toward merger with Park Presidio. These are some specific steps that have been or will be taken:

"On October 2, I met with Diane Knudsen, our Annual Conference Treasurer and staff person with the Conference Board of Trustees, at First St. John's. She will prepare the necessary documents for our Board of Trustees to transfer title to the Conference Board of Trustees, hopefully by November 1. I also met the real estate agent Diane has asked to be the property manager beginning this November. Our present tennants will be notified of the change of ownership.

"We will transfer any usable and removable office equipment, kitchenware, and other materials to Park Presidio or Sun Moon Residence during the month of October.

"On Tuesday, October 28, 7:30 p.m., our District Superintendent, The Rev. Jane Schlager, will conduct a Charge Conference at the Park Presidio Church at Seventh and Geary Boulevard. At that time she has asked both congregations to meet separately to vote on merger, and then meet together to transact the necessary business as a merged congregation. I hope that you will be present to participate in this important meeting.

I hope and pray that each of you will take seriously the responsibility as members of the merged Church. With your presence and commitment, you can help your new church to fulfill its vision: "We are a congregation of Hope, guided by God's Spirit that respects the dignity and diversity of all Creation. We value compassion and justice as we work for peace in our neighborhoods near and far."

God's Grace and Peace be with each of you!

Sincerely,

Lloyd K. Wake

Lloyd K. Wake

05/30/2007  10:18   9163725544                                   PAGE  03
HPH-18-2007  13:30                    CA NV ANNUAL CONF                    P.02

## First St. John's United Methodist Church
1600 Clay Street
San Francisco, CA 94109-3702

Administrative Pastor (415) 567-9020
email <mhwake@mindspring.com>

## Report of First St. John's to October 28, 2003 Charge Conference, Park-Presidio United Methodist Church

At its Charge Conference on 6/1/03 First St. John's Church voted its intention to merge with Park-Presidio United Methodist Church. This vote came after many meetings, discussions, joint meetings and sharing fellowship with Park-Presidio folks since June, 2002. Today First St. John's votes to merge with Park Presidio United Methodist Church., Haddie Barae, Charles Vancepuye, Natasha )Caghai, Adrienne Eng

After a vote of both congregations in July, 2003, the name of the merged church was determined to be "Park-Presidio United Methodist Church".

It has been a long and productive journey with significant accomplishments. We have agreed on a Vision Statement as follows: "We are a congregation of Hope, guided by God's Spirit that respects the dignity and diversity of all Creation. We value compassion and justice as we work for peace in our neighborhood near and far."

We have agreed on several principles which will inform our decisions about developing ministry to fulfill our vision. These are:
1. The ministry of the church will be Christ-centered which is contextual both historically and culturally.
2. The ministry of the church will affirm, receive and utilize the historical and unique characteristics of  of both churches: the social justice ministry of First St. John's, and the community ministry in the changing neighborhood of Park-Presidio.
3. The ministry of the church is committed to promoting cooperative relations among United Methodist churches in the context of connectionalism that affirms and encourages empowerment of local congregations.

One of the first events we will plan for after merger is a Planning Conference/Retreat in which the mission of the church will be clarified and strategies to fulfill the mission will be adopted. We expect that any strategic plans related to the building and property that the pre-merger Park Presidio Church may have developed will be shared with First St. John's members. It is our desire to fully participate and cooperate in the effort to incorporate the strategic use

BOS 00010

# Exhibit B

HPR-12-05 03:36P
HPR-12-2005 TUE 04:16 PM   Frick Buscovich Assoc.   FAX NO.   500005                          P. 2

# PATRICK BUSCOVICH & ASSOCIATES

WWW.BUSCOVICH.COM
STRUCTURAL ENGINEERS, INC.

235 MONTGOMERY STREET, SUITE 823, SAN FRANCISCO, CALIFORNIA 94104 · TEL: (415) 788-2706 FAX: (415) 788-8653

May 25, 2004

Diane Knudsen
Director of Administrative Services
California-Nevada Annual Conference
The United Methodist Church
1276 Halyard Drive
West Sacramento, California 95691

FAX:   916.372.5544

RE:   1601 Larkin St. – St. John Methodist Church - Vacant
      1601 Clay St. – Kai Ming Head Start – Day Care

Job Number:   04.129

Dear Ms. Knudsen,

This letter addresses my code and preliminary seismic review of the subject building.

Introduction and Background. This unsprinklered building was constructed circa 1911 as a church at the main level and an assembly room assessory to the church on the lower level. The building permit history on the subject property is totally lacking. No original building permit is on file, and there is only one permit in 1957 for maintenance. The church hall on the street level is unoccupied, there appears to be a caretaker living in the mezzanine area (which was not inspected), and the basement is occupied by a day care with cooking facilities (which had over 40 children overseen by several adults on the day of my inspection).

Seismic and Structural Observations. On May 10, 2004 I personally inspected the property and toured the basement and street levels of the structure. Based upon my site visit and my review of the permit history, no seismic upgrade has ever been done on the 1911 structure. I have the following concerns for the building and its occupants:

1)   In 1911, the standard for seismic resistance was minimal, if any;

2)   The lower level is virtually one room with minimal interior walls to resist seismic forces;

3)   The lower level perimeter walls appear to have brick veneer over concrete. These perimeter concrete walls may not be reinforced (plain concrete) and may meet the definition of "unreinforced masonry" (see SFBC section 1603C, Unreinforced Masonry). I performed non-destructive testing on this wall and only found readings of possible nails and no reinforcing steel. It is recommended that the concrete walls be further tested to determine whether it has reinforcement steel. If the wall is not properly reinforced, then this building falls under the "Unreinforced Masonry Building" (UMB) program. It appears this building may meet the definition of a UMB, and in my opinion, it is inappropriate to have an E-3 occupancy (Day Care Facility) in a UMB building;

June 11, 2004
N:\Letter\2004\04.129 - 1601 Larkin St. Final.doc

BOS 00051

4)  In 1981 the occupancy change discussed below probably triggered a mandatory seismic upgrade to the lower level per the SFBC. In my opinion, this building, regardless of possible code loopholes is unsafe for occupancy and needs significant seismic retrofitting to be used for day care;

5)  The portion of the building sitting on the perimeter concrete walls which extends approximately four (4) feet above Larkin street and sloping along Clay Street is wood frame with numerous large window penetrations and no apparent shear or anchor elements; and

6)  Superficial observation without benefit of destructive testing through a stucco topcoat reveals visible dry rot in numerous places visible on the exterior. To the extent this condition extends into the structural members, the building's integrity could be further compromised. I recommend the building be thoroughly inspected to determine the extent of damage.

Code Analysis and Present Occupancy. In 1977 the lower level assembly room was converted to a day care for an unknown number of children for the church. By the San Francisco Building Code (SFBC), this was a change of occupancy from occupancy Group A (assembly) to a occupancy Group E-3 (education/day care). A building permit to effect this change of use may not have been required in 1977 since that day care was accessory to the church use. I have not found any records of this building permit, although, the State Day Care Licensing Department should have required the lower level be a legal E-3 occupancy.

In 1981 Kai Ming took over the day care per the Fire Department record. At this time a building permit for a change of use should have been required because the day care was run by a new tenant not the church. Filing a building permit to change the occupancy would have triggered a number of code issues by both the Department of Building Inspection (DBI) and the San Francisco Bureau of Fire Prevention (BFP). I was unable to determine how this change of occupancy occurred. Without a record of a permit it could be due to the fact that no one at DBI was notified of the change of use from church day care to tenant day care. A number of code issues should have been resolved with a building permit regarding a E-3 occupancy, for example, whether the lower level is a basement or the first floor of the building. The code requirement for an E-3 use in a basement is different than for a first floor day care. These are important issues to both the Fire Marshall who regulates E-3 occupancies and DBI.

Both the Building and Fire Departments have visited the building this year regarding a complaint. Not reviewed at this time by either the Fire or Building Department was the need of a building permit to run a day care run by a tenant and not by the church.

I also reviewed the Planning Department files on the building. A conversion of the lower level to day care requires a Conditional Use Permit. No Conditional Use Permit application was on file at the Planning Department.

BOS 00052

APR-12-2005 TUE 04:17 PM   -ick Buscovich Assoc.   FAX NO. 4   388653       P. 03   P. 4

Exiting. Finally, I am very concerned about the exiting from the lower level. This is of particular concern since the building is not sprinkled and the main level (church) is vacant. Areas of concerns are the following:

1) Tall partitions blocking the view of the exit doors;
2) Exit signs not lighted and without back-up power and lights;
3) Obstructions against the northeast exit door, and
4) Partitions and furniture blocking a path of travel to exits.

The present use fails to address reasonable life safety precautions for fire or earthquake.

3

BOS 00053

# Patrick Buscovich & Associates Structural Engineers Inc

WWW.BUSCOVICH.COM

235 MONTGOMERY STREET, SUITE 923, SAN FRANCISCO, CALIFORNIA 94104-2906 • TEL (415) 788-2708 FAX (415) 788-9653

December 29, 2005

Diane Knudsen
Director of Administrative Services
California – Nevada Annual Conference
The United Methodist Church
1276 Halyard Dr.
West Sacramento, CA. 95691

Attn: Diane Knudsen

RE: 1601 Larkin St. – St. John Methodist Church
1601 Clay St. – Lower Level

Subject: Ground Floor Perimeter Wall

Job Number: 04.129, |

Dear Ms. Knudsen,

This letter supplements by earlier letter of May 25, 2004 wherein I recommended in paragraph 3 that further testing be done to determine whether the concrete walls have reinforcement steel.

On December 1, 2005, I returned to the building for re-inspection and conducted both nondestructive and destructive testing relative to potential seismic performance and foundation reinforcement. My observations and conclusions were that:

1. The lower level is virtually one room with minimal interior walls to resist seismic forces;

2. The lower level perimeter walls appeared to have a brick veneer over plain, unreinforced concrete bearing walls (plain concrete) and to possibly meet the definition of "Unreinforced Masonry" (see SFBC section 1603C, Unreinforced Masonry).

I performed non-destructive magnometer testing on the walls and found only readings of possible nails, but of no reinforcing steel. The walls were then tested by destructive chipping (see attached photos) to determine whether they had any reinforcement steel. The destructive testing revealed that the walls have no reinforcement steel. Thus, this building falls under the "Unreinforced Masonry Building" (UMB) program.

If you have any questions, please feel free to call (415) 788-2708 x102.

Sincerely,

Patrick Buscovich No. S 002708
Structural Engineer

EXP 6/30/06
S16N 12/29/05

Attachment: Photos

December 29, 2005
N:\Letter\2004\04.129 - 1601 Larkin St. and 1601 Clay St..doc

BOS 00054






BOS 00055






BOS 00056









BOS 00057




BOS 00058

# Exhibit C

# Cohen ◆ Durrett, LLP

## *Attorneys at Law*

David L. Cohen
David B. Durrett
Gregory M. Finch

Julie V. Reiser
Gordon W. Egan
*of Counsel*
Jonathan C. Riese

May 21, 2007

**Via Hand Delivery**

The Honorable Aaron Peskin, President,
and Members of the San Francisco
Board of Supervisors
1 Dr. Carlton B. Goodlett Place, Room 244
San Francisco, CA 94102-4689

   **Re: Objection to Resolution No. 070625 and All Proceedings for Designation
   of First St. John's Methodist Church at 1601 Larkin Street/1600 Clay Street
   as a Landmark San Francisco Planning Department Case No. 2004.0557ECV**

Dear President Peskin and Members of the Board of Supervisors:

        This office represents the California-Nevada Annual Conference of the
United Methodist Church ("Church"), the owner of the First St. John's Methodist Church
located at 1601 Larkin Street, San Francisco (the "Property"). We write separately to
object to the City and County of San Francisco ("City") taking any action in furtherance
of Resolution No. 070625 (introduced at the Board of Supervisors on May 8,
2007)("Resolution"), or otherwise, to designate the Property as a City landmark based on
a violation of federal law. We incorporate the concurrent submissions with exhibits
explaining the background of the current dispute

        The City's proposal to designate the Property as a landmark would violate the
Federal Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), 42
USC § 2000cc, because it would impose a substantial burden on the Church's religious
exercise and the City has not demonstrated a compelling government interest or that it is
employing the least restrictive means of furthering that compelling government interest.

## THE CITY'S PROPOSED ACTION WOULD VIOLATE FEDERAL LAW

   A.   The proposed Resolution violates the RLUIPA.

   42 U.S.C.A. 2000cc provides in pertinent part as follows:

8880 Cal Center Drive, Suite 190, Sacramento, California 95826
(916) 361-8797   www.cohendurrett.com   (916) 361-8798 fax

BOS 00030

The Honorable Aaron Peskin, President,
and Members of the San Francisco
Board of Supervisors
Re: Objection to Resolution No. 070625 and All Proceedings for Designation of First St.
John's Methodist Church at 1601 Larkin Street/1600 Clay Street as a Landmark San
Francisco Planning Department Case No. 2004.0557ECV
May 21, 2007
Page 2 of 5

"(a) Substantial burdens

(1) General rule

No government shall impose or implement a land use regulation in a manner that
imposes a substantial burden on the religious exercise of a person, including a religious
assembly or institution, unless the government demonstrates that imposition of the
burden on that person, assembly, or institution--

(A) is in furtherance of a compelling governmental interest; and

(B) is the least restrictive means of furthering that compelling governmental interest.

(2) Scope of application

This subsection applies in any case in which--

(A) the substantial burden is imposed in a program or activity that receives Federal
financial assistance, even if the burden results from a rule of general applicability;

(B) the substantial burden affects, or removal of that substantial burden would affect,
commerce with foreign nations, among the several States, or with Indian tribes, even if
the burden results from a rule of general applicability; or

(C) the substantial burden is imposed in the implementation of a land use regulation or
system of land use regulations, under which a government makes, or has in place formal
or informal procedures or practices that permit the government to make, individualized
assessments of the proposed uses for the property involved."

When the Church decided to sell the Property to the Project Sponsor, the First St.
John's congregation enacted decided to use the sales proceeds as follows:

"The funds derived from the sale will be deposited in the United Methodist
Foundation. These funds and the accruing interest will then be made available for
developing and building a new congregation, new ministry initiative, or a
congregational development effort in San Francisco. The funds will be
administered by the Conference Board of Missions in consultation with the San
Francisco United Methodist Mission (SUMM), the Golden Gate District
Superintendent and, for three years, a former member of the First St. John's
UMC."

The Honorable Aaron Peskin, President,
and Members of the San Francisco
Board of Supervisors
Re: Objection to Resolution No. 070625 and All Proceedings for Designation of First St.
John's Methodist Church at 1601 Larkin Street/1600 Clay Street as a Landmark San
Francisco Planning Department Case No. 2004.0557ECV
May 21, 2007
Page 3 of 5

The Resolution would impose a substantial burden on the Church's religious
exercise because it prevents the Church from demolishing the building or otherwise using
the asset for the improvement of other church buildings or other community outreach
programs. Because the City has not demonstrated a compelling government interest to
justify the designation of the Property as a landmark, the Resolution violates the
RLUIPA.

B. The Resolution would not withstand the three-part analysis employed by the
Ninth Circuit.

The analysis employed by the Ninth Circuit just last year demonstrates that the
Resolution violates the RLUIPA. *Guru Nanak Sikh Society of Yuba City v. County of
Sutter*, 456 F 3d 978 (9th Cir. 2006). In *Guru Nanak*, a religious organization (Sikh)
applied for a conditional use permit to construct a temple on a 1.89 acre parcel. The
respondent county rejected the application because the proposed use was considered
incompatible with the low-density residential zoning in that area. The applicant
purchased a second, larger parcel in an agricultural zone of the unincorporated county
and submitted a second application for a CUP to construct a temple on that parcel. The
applicant obtained an EIR which the planning commission approved after making
approximately 33 mitigation recommendations, each of which the applicant accepted.
The planning commission approval was then appealed to the Board of Supervisors, who
reversed the decision to grant the CUP.

The applicant filed suit under RLUIPA and moved for summary judgment. The
trial court granted summary judgment in favor of the applicant and issued an order
enjoining the county to approve and grant the CUP application. The County appealed the
summary judgment to the Ninth Circuit Court of Appeals, who affirmed.

In affirming the summary judgment for the applicant, the Ninth Circuit subjected
the CUP application to the following three-part analysis. Taking each of these factors in
turn establishes that as in *Guru Nanak*, the Church will be able to state a claim for
violation of the RLUIPA against the City if it designates the subject Property as a
landmark:

1.    Individualized land use assessments.

The Honorable Aaron Peskin, President,
and Members of the San Francisco
Board of Supervisors
Re: Objection to Resolution No. 070625 and All Proceedings for Designation of First St.
John's Methodist Church at 1601 Larkin Street/1600 Clay Street as a Landmark San
Francisco Planning Department Case No. 2004.0557ECV
May 21, 2007
Page 4 of 5

     The Ninth Circuit found in *Guru Nanak* that the County's decision to reject the
CUP application constituted an "individualized assessment of the proposed uses for the
property involved" sufficient to implicate the RLUIPA. *Guru Nanak, supra,* 456 F 3d at
986. Though zoning codes are drafted neutrally to apply to property owners, the Ninth
Circuit noted that "when the Zoning Code is applied to grant or deny a certain use to a
particular parcel of land, that application is an 'implementation' under" the RLUIPA. *Id.*
at 987. Accordingly, the court held that the decision to deny the CUP application
implicated the RLUIPA.

     Similarly here, the Resolution constitutes an "individualized assessment of the
proposed uses for the property involved," sufficient to trigger application of the RLUIPA.
Finding that the Property qualifies for landmark status necessarily entails applying the
planning code to "grant or deny a certain use to a particular parcel of land" and is thus an
"implementation" under the RLUIPA. Accordingly, the Church will state a claim for
violation of that statute.

    2.   Substantial Burden under RLUIPA

     The Ninth Circuit also found that the County's denial of the CUP application
imposed "a substantial burden on the religious exercise of a person, including a religious
assembly or institution…" under 42 U.S.C.A. Section 2000cc (a)(1). The County argued
that it had not imposed a substantial burden on the applicant because it still could apply
for a CUP on another parcel within the County. The Ninth Circuit rejected this argument,
noting that the general reasons given by the County in denying the second CUP "could
easily apply to all future applications by Guru Nanak." (*Id.* at 989). The court concluded
as follows: "Because the County's actions have to a significantly great extent lessened
the prospect of Guru Nanak being able to construct a temple in the future, the County has
imposed a substantial burden on Guru Nanak's religious exercise." Id. at 992.

     The substantial burden imposed on the Church's religious exercise is clear if the
Resolution passes. The Church will be prevented from demolishing the building or take
other actions with regard to the Property to further its religious exercise. The Resolution
thus imposes a greater burden than the Ninth Circuit rejected in *Guru Nanak*: the
Resolution will deny the Church the only reasonable course of action, demolition and use
of the asset to further its religious purposes elsewhere. In *Guru Nanak,* the Ninth Circuit
found a RLUIPA violation because the County decision "to a significantly great extent
lessened the prospect" of religious exercise. Here, because the Resolution deprives the

BOS 00033

The Honorable Aaron Pe_x_n, President,
and Members of the San Francisco
Board of Supervisors
Re:  Objection to Resolution No. 070625 and All Proceedings for Designation of First St.
John's Methodist Church at 1601 Larkin Street/1600 Clay Street as a Landmark San
Francisco Planning Department Case No. 2004.0557ECV
May 21, 2007
Page 5 of 5

Property of any economic value, the Resolution clearly imposes a substantial burden on
the Church's religious exercise.

    3.    <u>The City has Shown no Compelling Interests</u>

In *Guru Nanak*, the County showed no compelling interests in the denial of the
CUP application or "that the restrictions are narrowly tailored to accomplish such
interests." *Id.* at 992. Similarly here, the Resolution serves no compelling state interests
and is not "narrowly tailored to accomplish such interests."

    C.    <u>Conclusion</u>

As with the applicant in *Guru Nanak*, the Church has satisfied the three elements
of a RLUIPA claim sufficient to enjoin the City from enacting the Resolution. The
Church respectfully requests that the Board of Supervisors immediately cease considering
the Property for landmark designation and take no other actions in the future to impose
land use regulations to interfere with the Church's rights to sell, develop or use the
Property, pursuant to Articles 10 & 11 of the Planning Code or otherwise.

    Very truly yours,

    COHEN♦DURRETT, LLP

    GORDAN W. EGAN

GWE/sg

cc:    Dennis Herrera and Cheryl Adams, Office of the City Attorney
    Michael Li, Planning Department
    Viktoriya Wise, MEA, Planning Department
    Diane Knudsen
    Joel Yodowitz, Esq.