UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **CALIFORNIA-NEVADA ANNUAL CONFERENCE OF THE METHODIST CHURCH,** | Case No.  11-cv-02338-YGR |
| Plaintiff, | |
| v. | **ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS** |
| **CITY AND COUNTY OF SAN FRANCISCO,** | |
| Defendant. | |

Now before the Court is the motion of the City and County of San Francisco ("the City") to dismiss the First Amended Complaint ("FAC") of Plaintiff California-Nevada Annual Conference of the Methodist Church ("the Conference"), in which the Conference alleges the following three causes of action:  (1) violation of the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), 42 U.S.C. §§ 2000cc et seq.; (2) violation of the First Amendment; and (3) regulatory takings under 42 U.S.C. § 1983.  (Dkt. No. 161; *see also* Dkt. No. 159.)  The Conference has filed an opposition in response thereto, and the City has replied.  (Dkt. Nos. 164, 165.)

Having carefully considered the papers submitted and the pleadings in this action, the arguments of counsel, and for the reasons set forth below, the Court hereby **GRANTS IN PART** and **DENIES IN PART** the City's motion.[1]

I.    **FACTUAL BACKGROUND**

At the center of this case is a Methodist Church formerly located at 1601 Larkin Street in the Russian Hill area of San Francisco (the "church" or the "property").  The church was constructed after the 1906 earthquake.  (FAC ¶ 14.)  In the 1930s and 1940s, the church enjoyed

---

[1] Pursuant to Federal Rule of Civil Procedure 78(b) and Civil Local Rule 7-1(b), the Court determined this motion suitable for decision without oral argument.

United States District Court
Northern District of California

United States District Court
Northern District of California

1  its largest membership, but by the 1970s, the congregation had declined.  By 2000, the

2  congregation totaled only eight members, and the building was showing serious effects of wear

3  and age.  (FAC ¶¶ 18, 19.)  The congregation determined that the church was "functionally

4  obsolete and structurally deficient to the extent that it could not be safely occupied."  (*Id*. ¶¶ 1,

5  20.)  In 2003, the congregation stopped using the property for religious purposes (*id*. ¶ 21) and in

6  2004, transferred title to the Conference to facilitate the sale of the property.  (*Id*. ¶ 22.)  Funds

7  derived from the sale would be used for the development and building of a new congregation, new

8  ministry initiative, or a congregational development effort in San Francisco.  (*Id*. ¶ 21; Exh. A.)

9        In 2004, the Conference agreed to sell the property to Pacific Polk Properties, LLC

10  ("Pacific Polk") for the construction of market rate condominiums.   (*Id*. ¶¶ 21, 25.)  The purchase

11  price was $3,000,000.  As a condition, however, the parties agreed that the church structure had to

12  be demolished.  (*Id*. ¶¶ 1, 25.)  The Conference and Pacific Polk thus undertook to obtain the

13  required permits and authorizations.  They filed applications with the San Francisco Planning

14  Department ("Department") to demolish the existing church structure and construct a new

15  residential building on the property, and for environmental review of the project.  (*Id*. ¶ 29.)  On

16  March 22, 2005, the Department's Environmental Review Officer determined that the Project

17  required an environmental impact report ("EIR") under the California Environmental Quality Act,

18  Public Resources Code §§21000 *et seq*. ("CEQA"), to analyze its potential environmental effects.

19  (*Id*. ¶ 30.)  The City published a draft EIR on April 14, 2007.  (*Id*.)

20        Almost three years after the Conference and Pacific Polk submitted their initial

21  applications, on May 21, 2007, the Land Use and Economic Development Committee of the San

22  Francisco Board of Supervisors held a hearing at which it was suggested for the first time that the

23  property be designated a "landmark."  (*Id*. ¶ 32.)  Over objection from the Conference, the

24  resolution passed.  (*Id.*)  On June 5, 2007, the resolution was adopted by the full Board of

25  Supervisors, referring the matter to the City of San Francisco Historic Preservation Board for

26  further study and having the effect of ceasing the land use entitlements and demolition permit.  (*Id.*

27  ¶ 33; Exh. F.)  In May 2008, the California Superior Court found in favor of the Conference and

28  the City was required to cease its landmarking proceedings.  (*Id*. ¶ 37; Exh. H.)  The City

2

United States District Court
Northern District of California

1   appealed.  (*Id.* ¶ 39.)  Approximately one year later, the California Court of Appeal unanimously

2   affirmed the Superior Court's ruling, finding in the Conference's favor that the City had acted

3   outside of its authority and could not landmark the property.  (*Id.*)

4       Proceedings on the Conference and Pacific Polk's application for a conditional use permit

5   authorization and a variance to demolish the church structure recommenced.  On May 27, 2010, a

6   year after the Court of Appeal issued its decision, a comments and responses document was

7   published, containing the Department's responses to comments received on the 2007 Draft EIR.

8   (*Id.* ¶ 41.)  On June 24, 2010, the Planning Commission ("Commission") held a public hearing to

9   consider certification of the final EIR and approval of the project, including whether alternatives

10  could preserve part of the church structure.  (*Id.* ¶¶ 42-43.)  The Conference submitted reports of

11  three structural engineers, all of whom expressed serious concerns regarding structural

12  disintegration caused by severe rot.  (*Id.* ¶¶ 47-50.)  After deliberation, the Commission did not

13  certify the final EIR.  (*Id.* ¶ 55.)

14      The Commission then turned to the question of Pacific Polk's conditional use permit

15  application for the construction of the new 27-unit residential building and, impliedly, to the

16  Conference's application for the demolition of the existing church structure.  (*Id.* ¶¶ 42, 57-58.)

17  After closing public comment and deliberation, the Commission voted to deny the conditional use

18  permit, essentially denying the Conference's demolition permit application as well.  (*Id.* ¶ 62;

19  Request for Judicial Notice ("RJN"), Exh. 1.[2])  Because the Commission had denied the

20  conditional use permit, and the zoning administrator had disapproved the variance, on September

21  1, 2010, the Department of Building Inspection cancelled the applications for a demolition permit

22

---

23      [2] In support of its motion, the City has submitted requests for judicial notice of documents
    and facts including records of administrative hearings and decisions of the city departments and
24  boards that presided over the Conference's applications for demolition and conditional use
    permits, as well as filings from the state court litigation between the parties.  (Dkt. Nos. 162, 166.)
25  Under Federal Rule of Evidence 201, a judicially noticed fact must be one "not subject to
    reasonable dispute" insofar as it is either "generally known within the territorial jurisdiction of the
26  trial court" or "capable of accurate and ready determination by resort to sources whose accuracy
    cannot reasonable by questioned."  Fed. R. Evid. 201(b).  Finding that these documents meet this
27  standard, and noting that the Conference has posed no objection to judicial notice of these
    documents, the Court hereby **GRANTS** the City's requests for judicial notice.  (Dkt. Nos. 162, 166.)
28

1    and building permit.  (RJN, Exhs. 3, 4.)  On January 19, 2012, the Commission voted that it

2    "would accept a new conditional use permit application [for the project] that could rely on the

3    existing environmental evaluation application, which may result in revisions to the draft EIR for

4    changes to the project or the setting in which it is proposed."  (RJN, Exh. 5.)

5        On June 14, 2012, the Department published a revised EIR for the project ("revised EIR")

6    that reflected a new design and described several variants that would preserve portions of the

7    existing church while constructing a new residential building on the property.  On June 28, 2012,

8    the Commission reviewed and certified the revised EIR.  (RJN, Exh. 6.)  At the same meeting, the

9    Commission conducted a public hearing on Pacific Polk's new application for a conditional use

10   permit. The Commission disapproved Pacific Polk's application.  (RJN, Exh. 7.)  What followed

11   were more community meetings in an attempt to reach political and social consensus.

12       On October 3, 2013, Pacific Polk presented a revised proposal for its condominium

13   project.  That same day, the Commission approved a conditional use permit for Pacific Polk's

14   condominium project.  (RJN, Exh. 8.)  Based on the Commission's decision, the zoning

15   administrator granted the requested variances and issued a decision on November 15, 2013.  (RJN,

16   Exh. 9.)  On November 25, 2013, the "Nob Hill Neighbors" appealed the zoning administrator's

17   grant of a variance to Pacific Polk to the Board of Appeals.  (FAC ¶ 82.)  The Board of Appeals

18   heard the matter on January 29, 2014, and denied the appeal.  (*Id*.; RJN, Exh. 10.)

19       On April 30, 2014, almost ten years after the Conference first sought the demolition

20   permit, the Department of Building Inspection issued a demolition permit allowing Pacific Polk to

21   demolish the structure and a building permit allowing Pacific Polk to build its condominium

22   project.  (FAC ¶ 82.)  On or about May 16, 2014, Pacific Polk demolished the structure and

23   cleared the site for construction of its condominium project.  (*Id*. ¶ 83.)[3]

24

25

26

27       [3] On May 5, 2011, the Conference filed its original complaint in this action. (Dkt. No. 1.)
     On August 29, the Conference filed its First Amended Complaint, which set forth the events
28   which had transpired since the original filing.  (Dkt. No. 159.)

1     **II.**    **LEGAL STANDARD**

2        A motion to dismiss for failure to state a claim under Rule 12(b)(6) tests the legal

3 sufficiency of a complaint. *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). On a motion to

4 dismiss, all allegations of material fact are taken as true and construed in the light most favorable

5 to the nonmovant. *Cahill v. Liberty Mut. Ins. Co*., 80 F.3d 336, 337–38 (9th Cir. 1996). The

6 Court need not accept as true "allegations that are merely conclusory, unwarranted deductions of

7 fact, or unreasonable inferences." *In re Gilead Scis. Secs. Litig*., 536 F.3d 1049, 1055 (9th Cir.

8 2008). In deciding a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil

9 Procedure, the Court must limit its review to the contents of the complaint, *Clegg v. Cult*

10 *Awareness Network*, 18 F.3d 752, 754–55 (9th Cir. 1994), including documents physically

11 attached to the complaint or documents the complaint necessarily relies on and whose authenticity

12 is not contested, *Lee v. City of Los Angeles*, 250 F.3d 668, 688-89 (9th Cir. 2001). In addition, the

13 Court may take judicial notice of facts that are not subject to reasonable dispute. *Lee*, 250 F.3d at

14 688.

15     **III.**    **DISCUSSION**

16        The City contends that all of the Conference's claims fail as a matter of law. First, the City

17 argues that the Conference has failed to state a cause of action under RLUIPA for three reasons.

18 One, the sale of the Property for a secular use does not constitute a "religious exercise" protected

19 by RLUIPA, even if the proceeds from that sale would be used to further a religious purpose.

20 Two, the City's denial of Pacific Polk's conditional use permit in 2010 and 2012, as well as the

21 2007 fact-finding process, did not impose a "substantial burden" as prohibited by RLUIPA.

22 Three, the denial of Pacific Polk's demolition and building permits was based on CEQA and the

23 City's Building Code, which are not zoning or landmarking laws. Based on the foregoing, the

24 City argues that the Conference's claim reaches far beyond the scope of RLUIPA and thus, must

25 be dismissed.

26        The City next challenges the Conference's First Amendment claim, asserting that because

27 the Conference has alleged claims relating to the application of general zoning and land use laws,

28 the City need only meet a rational basis standard. The City maintains that because the Conference

United States District Court
Northern District of California

5

1    has not alleged facts sufficient to establish that this standard has not been met, the Conference's

2    First Amendment claim fails as a matter of law.

3         Finally, the City argues that the Conference's regulatory takings claim fails for a variety of

4    reasons, including ripeness, statutes of limitations, and res judicata.

5         The Court considers each argument in turn below.

6    **A.    RLUIPA'S ENACTMENT AND STATUTORY FRAMEWORK**

7         Because the question of RLUIPA's scope bears directly on the question before the Court –

8    whether a religious assembly's sale of land for non-religious use can constitute "religious

9    exercise" covered by RLUIPA, even if the profits from the sale will go toward furthering a

10   religious mission – the Court first summarizes the context that led to RLUIPA's enactment and the

11   statutory framework relevant to this case.

12        RLUIPA represents Congress' latest effort to protect the free exercise of religion

13   guaranteed by the First Amendment from government regulation.  Congress' first attempt to

14   legislate protections for such activity followed the Supreme Court decision *Employment Div.,*

15   *Dept. of Human Res. of Or. v. Smith*, 494 U.S. 872 (1990) ("*Smith*").  In *Smith*, the Supreme Court

16   held that neutral laws of general application could, consistent with the constitution, prohibit

17   conduct prescribed by one's religion.  The Supreme Court determined that such laws did not have

18   to be supported by a compelling government interest, even if they had the incidental effect of

19   burdening religion.  *Id*. at 885.  Even where the burden on religion was substantial, the Court

20   rejected that the state demonstrate a compelling interest.  *Id*. at 883-34.

21        In direct response to *Smith*, Congress enacted the Religious Freedom Restoration Act

22   ("RFRA"), 42 U.S.C. § 2000bb *et seq*.  Relying on its enforcement powers under Section 5 of the

23   Fourteenth Amendment, through RFRA, Congress attempted to codify the pre-*Smith* free-exercise

24   jurisprudence by providing that "[g]overnment shall not substantially burden a person's exercise

25   of religion" unless "it demonstrates that application of the burden to the person . . . is in

26   furtherance of a compelling government interest and ... is the least restrictive means of furthering

27   that compelling governmental interest."  42 U.S.C. § 2000bb-1(a).

28        The Supreme Court, however, held that RFRA was unconstitutional as applied to state and

1    local governments because it exceeded Congress' Section 5 powers. *City of Boerne v. Flores*, 521

2    U.S. 507, 536 (1997). Congress' Section 5 enforcement powers are limited to enacting legislation

3    that is "remedial" in nature. Such powers are limited to correcting documented constitutional

4    violations; there must be "congruence and proportionality between the injury to be prevented or

5    remedied and the means adopted to that end." *Id.* at 520. Because RFRA was "so out of

6    proportion to a supposed remedial or preventive object," and the legislative history "lack[ed]

7    examples" of the wrongs sought to be corrected, Congress's application of RFRA to state and

8    local governments was deemed unconstitutional. *Id.* at 530, 532, 536.

9        In response to the Supreme Court's partial invalidation of RFRA, Congress enacted

10   RLUIPA, 42 U.S.C. sections 2000cc-2000cc-5 (2000). RLUIPA "'replaces the void provisions of

11   RFRA[,]' and prohibits the government from imposing 'substantial burdens' on 'religious

12   exercise' unless there exists a compelling governmental interest and the burden is the least

13   restrictive means of satisfying the governmental interest." *Guru Nanak Sikh Soc. of Yuba City v.*

14   *Cnty. of Sutter*, 456 F.3d 978, 985-86 (9th Cir. 2006) (citing *San Jose Christian Coll. v. City of*

15   *Morgan Hill*, 360 F.3d 1024, 1033-34 (9th Cir. 2004) (quoting *Wyatt v. Terhune*, 315 F.3d 1108,

16   1112 (9th Cir. 2003) (citation omitted)). Specifically, RLUIPA provides that:

17              No government shall impose or implement a land use regulation in a
18              manner that imposes a substantial burden on the religious exercise
                of a person, including a religious assembly or institution, unless the
19              government demonstrates that imposition of the burden on that
                person, assembly, or institution—
20
21              (A) is in furtherance of a compelling governmental interest; and

22              (B) is the least restrictive means of furthering that compelling
                    governmental interest.
23
24   42 U.S.C.A. § 2000cc (West). "Religious exercise" as defined by RLUIPA is limited to:

25              (A) In general

26              The term "religious exercise" includes any exercise of religion,
                whether or not compelled by, or central to, a system of religious
27              belief.

28              (B) Rule

                                                    7

United States District Court
Northern District of California

> The use, building, or conversion of real property for the purpose of religious exercise shall be considered to be religious exercise of the person or entity that uses or intends to use the property for that purpose.

42 U.S.C.A. § 2000cc-5 (West).

To avoid RFRA's fate, Congress limited RLUIPA's reach to only regulations regarding land use and prison conditions.  *See id.* (citing *Cutter v. Wilkinson*, 544 U.S. 709, 715 (2005)).  Of particular import in this case is RLUIPA section 2000cc-(a)(2)(c), which relates to substantial burdens in the context of land use regulations.  Congress defined of what sorts of activities qualify as "land use regulations" as follows:

> The term "land use regulation" means a zoning or landmarking law, or the application of such a law, that limits or restricts a claimant's use or development of land (including a structure affixed to land), if the claimant has an ownership, leasehold, easement, servitude, or other property interest in the regulated land or a contract or option to acquire such an interest.

42 U.S.C. § 2000cc-5.  RLUIPA thus applies if "the substantial burden is imposed in the implementation of a land use regulation or system of land use regulations, under which a government makes, or has in place formal or informal procedures or practices that permit the government to make, individualized assessments of the proposed uses for the property involved," 42 U.S.C. § 2000cc(a)(2)(C).

Unlike RFRA, which applied broadly, Congress intended RLUIPA to be a "targeted bill" designed to address "frequently occurring burdens on religious liberty."  Prior to enacting RLUIPA, Congress compiled a substantial amount of statistical and anecdotal data demonstrating that governmental entities nationwide had purposefully excluded religious groups from communities by denying them land use permits.  *Guru Nanak Sikh Soc. of Yuba City*, 456 F.3d at 994 (citing H.R. REP. NO. 106-219, at 18-24 (1999) (summarizing the evidence from these hearings)).  Congress also heard persuasive anecdotal evidence regarding a trend of denying newcomer religious groups conditional use permits in buildings that formerly housed non-religious assemblies or that had housed widely accepted religious groups.  *Id.* (citing H.R. REP.

No. 106-219, at 21-22 (1999)).  The final bill was "based on three years of hearings . . . that addressed in great detail [] the need for legislation."  146 Cong. Rec. S7774-01 (daily ed. July 27, 2000) (Joint Statement of Senators Hatch and Kennedy).  The stated purpose of RLUIPA with respect to its land use protections included the following:

> The right to assemble for worship is at the very core of the free exercise of religion. Churches and synagogues cannot function without a physical space adequate to their needs and consistent with their theological requirements.  The right to build, buy, or rent such a space is an indispensable adjunct of the core First Amendment right to assemble for religious purposes.

*Id.*  RLUIPA's land use provision was designed to remedy the following sorts of violations of free exercise:

> Zoning codes frequently exclude churches in places where they permit theaters, meeting halls, and other places where large groups of people assemble for secular purposes. Or the codes permit churches only with individualized permission from the zoning board, and zoning boards use that authority in discriminatory ways.
>
> [. . .]
>
> Churches have been excluded from residential zones because they generate too much traffic, and from commercial zones because they don't generate enough traffic. Churches have been denied the right to meet in rented storefronts, in abandoned schools, in converted funeral homes, theaters, and skating rinks-in all sorts of buildings that were permitted when they generated traffic for secular purposes.

*Id.*

Thus, RLUIPA provides "remedies aimed at areas where . . . discrimination has been most flagrant."  *See Guru Nanak*, 456 F.3d at 994 (citing *South Carolina v. Katzenbach,* 383 U.S. 301, 315 (1966)).  Against this factual backdrop, the Ninth Circuit found that RLUIPA is a "congruent and proportional response to free exercise violations because it targets only regulations that are susceptible, and have been shown, to violate individuals' religious exercise."  *Id.* at 994-95.  Accordingly, the Ninth Circuit determined that in enacting RLUIPA, Congress did not exceed its authority under Section Five of the Fourteenth Amendment.

1   Under RLUIPA, the religious entity bears the burden of persuasion on whether zoning

2   laws, or the application of those zoning laws to a particular property, "substantially burdens" its

3   "exercise of religion."  *San Jose Christian Coll.*, 360 F.3d at 1034.  However, Congress directed

4   that RLUIPA "be construed in favor of a broad protection of religious exercise, to the maximum

5   extent permitted by the terms of this chapter and the Constitution."  42 U.S.C.A. § 2000cc-3

6   (West).

7   **B.   THE CONFERENCE'S RLUIPA CLAIM**

8   The Conference claims that the City violated its rights under RLUIPA "by imposing and

9   implementing a land use regulation that places a substantial burden on the Conference's religious

10   exercise."  (FAC ¶ 89.)  The Conference claims that its use of the property was burdened

11   substantially by the City's ten year delay in issuing a demolition permit (FAC ¶¶ 89-90; Opp. at 9-

12   10), which prevented it from converting the property into liquid assets that it could then use to

13   further its religious mission.  (FAC ¶ 84 ("The actions of the City have had many substantial

14   effects of [*sic*] the ability of the Conference and the various congregations in San Francisco to

15   practice their sincerely held religious beliefs.  Some examples of these include[:] the Conference

16   and congregations have been unable to expand evangelical outreach programs, make needed

17   repairs to buildings to provide safe places of worship, create new programs to expand Methodism

18   in San Francisco, feed the poor and provide shelter for the homeless."; Opp. at 10.)

19   The Conference does not claim that the sale itself was a form of religious exercise, nor that

20   the demolition of the church structure was religious exercise.  Rather, the Conference sought to

21   sell the property and capture a profit, which was then to be used "to further the Methodist religious

22   mission in San Francisco" and "to develop a new congregation, new ministry initiative or other

23   congregational development in San Francisco."  (FAC ¶¶ 1, 21.)  The Conference claims that its

24   ability to sell the property, which required demolition of the church structure, is protected by

25   RLUIPA and that the City's much-delayed issuance of permits to make the sale possible

26   constitutes a burden on the Conference's religious exercise.

27   The Court disagrees.  RLUIPA's statutory language, its legislative history, and relevant

28   case law establish that commercial endeavors such as that here – the sale of property for the

United States District Court
Northern District of California

10

construction of market rate condominiums – even if undertaken by the Conference in order to fund its religious mission, do not constitute "religious exercise" protected by RLUIPA.

### 1.  Legal Standard

RLUIPA applies if ". . . [the] burden is imposed in the implementation of a land use regulation or system of land use regulations, under which a government makes . . . individualized assessments of the proposed uses for the property involved." 42 U.S.C. § 2000cc(a)(2)(C).  As discussed above, RLUIPA provides that a government land-use regulation "that imposes a substantial burden on the religious exercise of a . . . religious assembly or institution" is unlawful "unless the government demonstrates that imposition of the burden . . . is in furtherance of a compelling governmental interest; and is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000cc(a)(1).  The Ninth Circuit has thus proscribed a two-step analysis for RLUIPA claims.  *Int'l Church of Foursquare Gospel v. City of San Leandro*, 673 F.3d 1059, 1066 (9th Cir. 2011).  First, the plaintiff must demonstrate that a government action has imposed a substantial burden on the plaintiff's religious exercise.  *Id.*  Second, once the plaintiff has shown a substantial burden, the government must show that its action was "the least restrictive means" of "further[ing] a compelling governmental interest."  *Id.*  (citations omitted).

Because the Court finds that the Conference has not stated a claim that the government action of which it complains has imposed a substantial burden on its religious exercise, the Court need not and does not reach the second step.

### 2.  Analysis:  Substantial Burden on Religious Exercise

In analyzing the Conference's RLUIPA claim, the threshold question is whether the activity the Conference claims was burdened —its ability to sell the property to Pacific Polk— constitutes religious exercise if the proceeds from the sale would be used to further its religious mission.  The Conference contends that its ability to sell the property for use on the commercial rental market constitutes "religious exercise."  The Court does not agree.

As stated above, RLUIPA provides that:

> No government shall impose or implement a land use regulation in a manner that imposes a ***substantial burden on the religious exercise***

of a person, including a religious assembly or institution, unless the government demonstrates that imposition of the burden on that person, assembly, or institution—

(A) is in furtherance of a compelling governmental interest; and

(B) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc(a)(1) (emphasis supplied).  Under RLUIPA, free exercise includes "any exercise of religion, whether or not compelled by, or central to, a system of religious belief."  42 U.S.C. § 2000cc−5(7)(A).  Particularly relevant to this case, RLUIPA provides that "[t]he use, building, or conversion of real property for the purpose of religious exercise shall be considered to be religious exercise of the person or entity that uses or intends to use the property for that purpose."  42 U.S.C. § 2000cc−5(7)(B).  The exercise need not be central to the religion in order to constitute protected religious exercise.

Despite the breadth of this language, however, Congress did not intend that every act undertaken by a religious entity would be considered "exercise" protected by RLUIPA.

> The definition of "religious exercise" under this Act includes the "use, building, or conversion" of real property for religious exercise. However, not every activity carried out by a religious entity or individual constitutes "religious exercise."  In many cases, real property is used by religious institutions for purposes that are comparable to those carried out by other institutions.  While recognizing that *these activities* or facilities may be owned, sponsored or operated by a religious institution, or ***may permit a religious institution to obtain additional funds to further its religious activities***, this alone does not automatically bring these activities or facilities within the bill's definition or "religious exercise."  For example, a burden on a commercial building, which is connected to religious exercise primarily by the fact that the proceeds from the building's operation would be used to support religious exercise, is not a substantial burden on "religious exercise."

146 CONG. REC. S7774-01 (July 27, 2000) (Joint Statement of Senators Hatch and Kennedy) (emphasis supplied).

Here, the Conference concedes that it did not intend to use the property for a religious purpose.  Instead, it obtained title to the property for the sole purpose of "facilitat[ing] the sale to a

third party." (FAC ¶ 22.) The Conference argues, however, that the proceeds from the sale were to go to furthering its religious mission. By burdening the Conference's ability to sell the property to a private developer for a commercial purpose, the Conference alleges that the City burdened its religious exercise and violated RLUIPA.

Construing the facts alleged in the light most favorable to the Conference, it is apparent that the nature of the activity the Conference claims was burdened – the sale of the property and demolition of the church structure – was not, in and of itself, religious exercise as defined by RLUIPA. The facts alleged establish that the Conference sought to secure a profit by the sale of unused property on the private market for non-religious use.[4] The Conference alleges that although it first sought to sell the property to low-income housing developers, no buyer was interested in paying "anywhere near the market price for the property." (FAC ¶ 24.) Indeed, one developer wanted to pay substantially less than market value. The Conference declined to sell the property to that developer, instead requiring that any purchaser pay market value. The Conference thus entered into a contract with Pacific Polk to sell the land at market value for the development of a market-rate condominium project. (*See* FAC ¶ 25.) The sale of the property was thus of a distinctly commercial and secular nature.

The fact that the proceeds from the sale were to be used to fund the Conference's religious efforts does not transform the sale transaction itself into "religious exercise" under RLUIPA. In passing RLUIPA, Congress expressly recognized the practical limits of what may constitute "religious exercise." As an initial matter, "not every activity carried out by a religious entity or

---

[4] The Conference argues that the state courts' finding that the City could not landmark the property because the property was a "noncommercial" property under California Government Code section 25373 compels a finding in favor of its RLUIPA claim. The Court disagrees. The state courts found that under California landmarking law, the property fell within a carefully circumscribed exception to the City's landmarking authority. *See California-Nevada Annual Conference of United Methodist Church v. City and County of San Francisco*, 173 Cal.App.4th 1559, 1565-69 (Cal. App. 2009). The state courts' holding on the applicability California law, however, is irrelevant to the question of whether the Conference has stated a claim separately under RLUIPA. The Conference does not explain how that finding, under state law, bears on the question of whether the *sale* of the property for development and resale on the private sector housing market constitutes "religious exercise" protected under RLUIPA.

United States District Court
Northern District of California

individual" qualifies.  146 CONG. REC. S7774-01 (July 27, 2000) (Joint Statement of Senators Hatch and Kennedy).  Specifically, Congress noted that with respect to real property issues, religious institutions regularly use real property for "purposes that are ***comparable to those carried out by other institutions***."  *Id.* (emphasis supplied).  Consequently, although the "facilities may be owned . . . by a religious institution, or ***may permit a religious institution to obtain additional funds to further its religious activities***, this alone does not automatically bring these activities or facilities within [RLUIPA's]  definition o[f] 'religious exercise.'"  *Id.* (emphasis supplied).

Here, the burdened activity – the sale of the property to a non-religious entity for the construction of market rate condominiums requiring demolition of the church structure – is of a commercial, as opposed to religious, nature.  The sale of property in order to dispose of a burdensome asset and secure a profit is an activity commonly undertaken by other entities in non-religious contexts.  Indeed, the Conference does not allege that the sale itself was in any way religious exercise, nor does the Conference allege that the demolition was in any way religious exercise.  *Cf. Roman Catholic Bishop of Springfield v. City of Springfield*, 760 F. Supp. 2d 172 (D. Mass. 2011) (removal of religious object as part of deconsecration process was religious exercise) *aff'd in part* 724 F.3d 78.  Rather, the Conference alleges that the proceeds from the sale would subsequently be used to further its religious mission.  As stated above, however, Congress recognized that although activities may permit a religious institution to obtain additional funds to further its religious activities, this does not automatically render such activities "religious exercise" as defined by RLUIPA.  Although the Conference undertook the sale to procure funds, the nature of any subsequent use of those funds does not alter the fundamentally commercial and secular nature of the sale in the first instance.

That such acts do not fall within "religious exercise" protected under RLUIPA makes sense given the Congress's purposes in passing the legislation.  As stated above, Congress was concerned that the right to assemble had been infringed by discrimination on the part of local authorities that had resulted in denying religious organizations physical spaces in which to worship.  Evidence adduced in hearings revealed that zoning codes had been used as a tool for

14

exclusion and discrimination:

> Churches have been excluded from residential zones because they generate too much traffic, and from commercial zones because they don't generate enough traffic.  Churches have been denied the right to meet in rented storefronts, in abandoned schools, in converted funeral homes, theaters, and skating rinks-in all sorts of buildings that were permitted when they generated traffic for secular purposes.

146 CONG. REC. S7774-01 (July 27, 2000) (Joint Statement of Senators Hatch and Kennedy).  The legislative history of RLUIPA is rife with evidence of discrimination against houses of worship, particularly the heavy burdens leveled against religious organizations seeking to buy or build places of worship.  In contrast, the legislative history revealed that secular entities do not encounter the same difficulties for similar approvals and permits.  Because "[t]he right to build, buy, or rent such a space is an indispensable adjunct of the core First Amendment right to assemble for religious purposes," Congress enacted RLUIPA.  *See id.*

In light of the above, it is apparent that Congress's enactment of RLUIPA was targeted to remedy the discriminatory exclusion of churches and religious organizations from communities, which had prevented religious assemblies from gaining access to physical spaces in which to worship.  The legislative history does not, however, support the expansion of RLUIPA to include protections of secular, commercial activity undertaken by religious organizations even where the profits derived may go toward a religious purpose.  Although no other case is precisely analogous to the one at bar, other courts have rejected similar attempts to expand RLUIPA to commercial activity based on similar reasoning.  *See Scottish Rite Cathedral Ass'n of Los Angeles v. City of Los Angeles*, 156 Cal.App.4th 108, 119-20 (Cal. App. 2007) (holding that commercial use of a religious facility does not constitute religious exercise under RLUIPA); *Greater Bible Way Temple of Jackson v. City of Jackson*, 733 N.W.2d 734, 746 (Mich. 2007) ("Something does not become a 'religious exercise' just because it is performed by a religious institution.  Because plaintiff has not shown that the building of the apartment complex constitutes an exercise in religion, the city's decision not to rezone the property cannot be said to have burdened plaintiff's 'religious exercise' "); *see also, Westchester Day School v. Village of Mamaroneck*, 386 F.3d 183,

190 n.4 (2d Cir. 2004) (finding "religious exercise" under RLUIPA to be narrower in scope than was espoused by the district court; RLUIPA does not protect a religious organization's improvement of its school facilities where school delivered both religious and secular education). The case cited by the Conference in support of its argument that the action here constitutes "religious exercise," *Third Church of Christ, Scientist, Washington D.C. v. District of Columbia Historic Pres. Review Bd.*, No. 08-CV-1371-JR (D.D.C. Aug. 7, 2008), is distinguishable.  There, a church sought to demolish an existing church building and construct a new church at the same site to better serve its religious needs.  (*Compare* Opp. at 19 *with* RJN. Exh. 20 (Complaint for Injunctive and Declaratory Relief and Nominal Damages).)  The court there was not presented with the question of whether the sale of property for a commercial purpose can constitute "religious exercise" under RLUIPA.  *Third Church* therefore does not support the notion that RLUIPA protections extend to secular, commercial activities undertaken by religious organizations to fund separate religious efforts.

The Court is also mindful of the fact that holding for the Conference and finding secular, commercial activity covered by RLUIPA presents potential constitutional concerns.  In *Guru Nanak*, the Ninth Circuit found RLUIPA constitutional because RLUIPA was limited to remedying "areas where discrimination has been most flagrant."  465 F.3d at 994 (citing *South Carolina v. Katzenbach*, 383 U.S. 301, 315 (1966)).  As demonstrated by the legislative history cited above, Congress enacted RLUIPA to address the pattern of discriminatory exclusion of religious assemblies by preventing them from buying, renting, or building physical spaces in which to worship.  *See id.* at 994.  Because Congress tailored RLUIPA to remedying proven discrimination of this sort, the Ninth Circuit found that RLUIPA was "congruent and proportional response to free exercise violations" and that Congress had not exceeded its constitutional authority.  *See id.* at 994-95.  In contrast, the Conference does not identify anything in the legislative record to suggest that religious organizations' ability to engage in commercial sales or fundraising activities were subject to similar discrimination or that Congress understood such activities to constitute "religious exercise" covered by RLUIPA.  Holding that RLUIPA extends to

United States District Court
Northern District of California

16

1  such instances would draw into question the congruence and proportionality of RLUIPA to the

2  harms Congress sought to remedy.

3       Moreover, the Court recognizes that RLUIPA "occupies a treacherous narrow zone

4  between the Free Exercise Clause, which seeks to assure that government does not interfere with

5  the exercise of religion, and the Establishment Clause, which prohibits the government from

6  becoming entwined with religion in a manner that would express preference for one religion over

7  another, or religion over irreligion." *Westchester Day School v. Village of Mamaroneck*, 386 F.3d

8  183, 189 (2d Cir. 2004).  A finding that religious organizations' commercial sale of property on

9  the private market for secular use is protected under RLUIPA, where similar activity undertaken

10  by secular organizations is not, threatens to cross the line between the government's protection of

11  religious exercise into a preference for religion generally.

12       For this and all the reasons stated above, the Court finds that where, as here, a religious

13  organization endeavors to sell a property for secular use on the private market, the sale itself does

14  not constitute "religious exercise" protected under RLUIPA even if the proceeds from the sale are

15  intended to be used to further the organization's religious mission.  Rather, where the sale is of a

16  commercial nature, it falls outside the scope of RLUIPA's protections.  Accordingly, the

17  Conference's RLUIPA claim fails as a matter of law, and the City's motion to dismiss this claim is

18  GRANTED.[5]

19      **C.**      **FIRST AMENDMENT CLAIM**

20       The City asserts that the Conference's First Amendment claim centers on San Francisco's

21  failure to issue a demolition permit and approve Pacific Polk's conditional use authorization for

22  over seven years.  (Mot. at 21.)  On that basis, the City contends that the Conference has failed to

23  state a claim because the operation of general application zoning and land use laws, "like those at

24  issue in this litigation," do not violate the First Amendment.  (*See id.*)  To that end, the City relies

25

26  --------------------------

27      [5] Given the long history of this case and the fundamental nature of the Conference's claim, the Court finds that no amendment could correct the deficiency analyzed above.  Accordingly, leave to amend is not granted.

28

United States District Court
Northern District of California

United States District Court
Northern District of California

upon two Ninth Circuit cases, *San Jose Christian Coll.*, 360 F.3d 1024 and *Christian Gospel Church v. City and County of San Francisco*, 896 F.2d 1221 (9th Cir. 1990).  (Mot. at 21-22.)  As an initial matter, although these cases support the City's argument that a rational basis standard should apply,[6] both of these cases were decided at summary judgment, not at the motion to dismiss stage.  More seriously, however, the City misconstrues the Conference's First Amendment claim, and therefore, its arguments in support of dismissal of this claim are inapposite.

The gravamen of the Conference's First Amendment claim is that the City's treatment of the Conference throughout the entire demolition, conditional use, and landmarking process – which took approximately a *decade* to complete – was discriminatory and substantially burdened its religious exercise.  Unlike the Conference's RLUIPA claim, which specifically hinged on the denial of the demolition permit and resultant inability to recoup profits on the land sale, the Conference's First Amendment claim is based upon a broader notion of unequal treatment – generally, that the City embroiled the Conference in bureaucratic proceedings, much of which were unnecessary, in an effort to prevent the Conference engaging in religious exercise.  (*See* FAC ¶¶ 91, 92.)

The FAC sets forth allegations concerning the City's allegedly discriminatory treatment of the Conference.  For example, the Conference alleges:

> On May 21, 2007, three years after the development project began, and after hundreds of thousands of dollars were expended upon processing the project, the Land Use and Economic Development Committee of the San Francisco Board of Supervisors held a hearing, entertaining for the first time a resolution introduced by Supervisor Peskin on May 8, 2007, to designate the Property as a "landmark."

---

[6] Because the Court resolves the City's motion as to the Conference's First Amendment claim on other grounds, the Court need not and does not take a position on what standard would apply if it did resolve the City's argument on its own terms.  The Court notes, however, that in its Opposition, the Conference offers a case to suggest that a different standard of review should apply (strict scrutiny).  (*See* Opp. at 21 (citing *Cottonwood Christian Center v. Cypress Redevelopment Agency*, 218 F.Supp.2d 1203, 1222-23 (C.D. Cal. 2002)).)  The City does not discuss, or distinguish, *Cottonwood* in its reply briefing.

United States District Court
Northern District of California

(FAC ¶ 32.)  Although the Conference "strenuously objected" to the landmarking and explained that California law exempts property owned by a church from landmarking if certain conditions are met, the City nonetheless proceeded.  (*Id.*; Exh. E (citing *East Bay Asian Local Development Corp. v. State of California*, 102 Cal. Rptr. 2d 280 (2000).)  Thus began two years of litigation, which resulted in two court decisions finding in the Conference's favor.  First, in May 2008, the Superior Court issued a Peremptory Writ requiring the City to halt its landmarking proceedings.  (FAC ¶ 37; Exhs. H, I.)  The City appealed, presumably requiring the Conference to expend resources opposing the appeal.  In May 2009, the California Court of Appeals issued a decision finding in favor of the Conference.  (FAC ¶ 39; *see also California-Nevada Annual Conference of United Methodist Church v. City and County of San Francisco*, 173 Cal.App.4th 1559, 1565-69 (Cal. App. 2009).)  Importantly, the Court of Appeals found that the City had acted "unquestionably" beyond its jurisdiction in undertaking landmarking efforts despite the Conference's stated objection.  (FAC ¶ 38.)[7]

Beyond the landmarking litigation, the FAC further alleges facts to suggest that City officials used bureaucratic and political mechanisms to delay the resolution of the Conference's application processes and disadvantage the Conference.  A year after the Court of Appeals decision in the landmarking matter was released (and six years after the original demolition and conditional use permits had been filed), the City Planning Department scheduled a hearing on the Final Environmental Impact Report ("FEIR"), the demolition permit, and the conditional use permit on a month's notice.  (*Id.* ¶¶ 41, 42.)  The Conference hired three structural engineers to assess the integrity of the church in order to refute any suggestion it and Pacific Polk should be forced to agree to some adaptive reuse of the structure.  (*Id.* ¶¶ 46-49.)  The Conference believed that such forced reuse would gut the building of value, thereby preventing or precluding the

---

[7] The Court of Appeals also noted that the *East Bay* opinion, which the Conference had cited in its letter to the Board of Supervisors, made "unmistakably clear that the statute permits a religiously affiliated nonprofit property owner 'to exempt its property from a landmark preservation law if the owner determines in a public form that application of the law will cause substantial hardship that is likely to deny the owner economic return on the property, or deprive the owner of reasonable or appropriate use of its property in furthering the owner's religious mission.'"  *California-Nevada*, 173 Cal.App.4th at 1565-66.

United States District Court
Northern District of California

1    Conference from using the sale proceeds in support of its religious mission.  (*See id*.)  According

2    to the FAC, the analyses of each structural engineer made clear that "no reuse of the existing

3    structure was possible without essentially rebuilding it from scratch.  No experts ever rebutted

4    these structural engineering reports . . . ."  (*Id.* ¶ 50.)  Prior to the hearing, the Planning

5    Department recommended to the Planning Commission that Pacific Polk's project be delayed or

6    denied and provided several reasons in support thereof.  (*Id.* ¶ 52.)  The Conference thus sought a

7    continuance of the hearing to address those issues.  (*Id.* ¶ 53.)  The FAC alleges that although

8    "continuances of this sort are routinely requested and regularly granted," the Commission denied

9    the request.  (*Id*.)  Moreover, the FAC contains allegations to suggest that the Commission did not

10   follow proper procedures during that hearing, which inured to the Conference's disadvantage.  For

11   example, the Commission "impliedly ruled on the application for a demolition permit as a part of

12   the application to build the proposed 27-unit condominium complex," even though counsel for

13   Pacific Polk had informed the Commission that the two applications were distinct and necessitated

14   two votes.  (*Id.* ¶ 59.)  Moreover, although the Commission "impliedly" denied issuance of the

15   demolition permit, the Commission gave no reasons for that denial.  (*Id.* ¶¶ 60, 62.)  The

16   Conference also alleges that the City essentially targeted the Conference and cited it for a variety

17   of code violations following that hearing:

18              Subsequent to the 2010 hearing, the City, apparently at the behest of
                elected City officials, repeatedly issued citations to the Conference
19              for various violations of City code, to force compliance with its
                demands to maintain and rehabilitate the structure and to harass the
20              Conference into complying with the elected officials' demands to
                preserve the structure.
21

22   (*Id.* ¶ 63.)  The City apparently continued to insist that demolition of the church structure was not

23   possible until the replacement project was approved and permitted.  (*Id.* ¶ 79.)  In mid-2012, after

24   multiple denials of the proposed project and demolition permit, the Conference and Pacific Polk

25   met with neighbors and community to try to reach consensus in a series of approximately twenty-

26   five meetings.  (*Id.* ¶ 76.)  The Conference alleges that at a Planning Commission meeting in

27   December 2012, the Commissioners expressed "hostility" and "anger" toward the Conference and

28   Pacific Polk for having brought the instant lawsuit and for challenging the earlier landmarking

1    effort.  According to the Conference, it was evident that the community negotiation process had

2    been used by the Commissioners to "stall the process and punish the Conference for exercise of its

3    constitutional and statutory rights."  (*See id.* ¶ 80.)

4            The Conference's final factual allegations relate to the harm it suffered due to the City's

5    actions including, ostensibly, its seemingly ill-advised landmarking attempt and the years-long

6    litigation to follow, the failure of City agencies to follow procedures to allow for resolution of the

7    Conference's demolition permit application, and City officials' abuse of the process to forestall

8    and delay resolution of the Conference's demolition permit for almost ten years.  (*See id.* ¶¶ 84-

9    85.)  According to the FAC, the City has a "long history of harassing religious institutions with

10   regard to their real estate."  (*Id.* ¶ 86.)  Some examples of the Conference's harms include: the

11   Conference and congregations have been unable to expand evangelical outreach programs, make

12   needed repairs to buildings to provide safe places of worship, create new programs to expand

13   Methodism in San Francisco, feed the poor, and provide shelter for the homeless.  (*Id.* ¶ 84.)

14           Construing the FAC in the light most favorable to the Conference and taking as true all

15   factual allegations therein, it is apparent that the Conference's First Amendment claim turns on the

16   City's alleged pattern and practice of intentionally subjecting the Conference to almost a decade of

17   bureaucratic proceedings, some of which were allegedly unnecessary, while others were allegedly

18   designed to harass and burden the Conference.  Because the City misconstrues the nature of the

19   Conference's allegations relating to its First Amendment claim, and therefore has offered no

20   persuasive argument as to why on the facts alleged no First Amendment claim has been stated, the

21   City's motion to dismiss this claim is **DENIED**.

22           **D.    REGULATORY TAKINGS CLAIM**

23           The Conference alleges that the history of conduct on the part of the City described above

24   forms the basis for its regulatory takings claim under 42 U.S.C. section 1983.  (FAC ¶¶ 93-98.)

25   Indeed, in its Opposition, the Conference confirms as much: ". . . [T]he Conference is not

26   asserting that some discrete act by San Francisco, such as the enactment of an ordinance resulted

27   [*sic*] in a taking.  Instead the Conference is asserting that a continuing ten year course of conduct

28   and including numerous refusals to grant a demolition permit resulted in a taking."  (Opp. at 24.)

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Accordingly, the Conference seeks damages "equal to the interest on the unpaid portion of the

2    purchase price of its sale to Pacific Polk and carrying costs since June 2007, when the City

3    commenced the landmarking process and ceased processing the demolition permit and other

4    entitlement applications." (FAC ¶ 97.)

5           Again, as was the case in the context of the Conference's First Amendment claim, the City

6    reads the Conference's regulatory takings claim as far more specific than what is in fact alleged in

7    the FAC. Having thus reformulated the regulatory takings claim as directed to certain government

8    actions at specified times, the City then undertakes to dispute whether each of those actions

9    qualifies as a regulatory taking, and raises various affirmative defenses to its reconceptualization

10   of the Conference's regulatory takings claim. (Mot. at 23-25.)

11          The Court declines to read the FAC as alleging that which is not identified specifically or

12   reasonably inferred, particularly in light of the Conference's representation that its regulatory

13   takings claim does not challenge any action specifically, but rather is based on an ongoing trend

14   of alleged impropriety.[8] Nonetheless, the Court finds that the Conference has failed to state a

15   regulatory takings claim.

16                       **1.  Legal Standard**

17          The Takings Clause of the Fifth Amendment provides: "[N]or shall property be taken for

18   public use, without just compensation." Regulatory takings claims are divided into two

19   categories: "facial" and "as-applied" challenges.

20          A facial challenge involves "a claim that the mere enactment of a
21          statute constitutes a taking," while an as-applied challenge involves
             "a claim that the particular impact of a government action on a
22          specific piece of property requires the payment of just
             compensation." *Keystone Bituminous Coal Ass'n v. DeBenedictis*,
23          480 U.S. 470, 494, 107 S.Ct. 1232, 1246, 94 L.Ed.2d 472 (1987).
             As the *Keystone* Court noted, there is "an important distinction"
24          between the two types of claims. Among other things, each raises
25          different ripeness and statute of limitations issues.

26   _____

27          [8] The Court notes that the Conference has not provided any case citations to support its
     theory that an ongoing course of conduct can form the basis for a regulatory takings claim. (*See*
28   Opp. at 24.)

1    *Levald, Inc. v. City of Palm Desert*, 998 F.2d 680, 686 (9th Cir. 1993).  Thus, any regulatory

2    takings claim impliedly must be linked to discrete governmental conduct or action, such as the

3    application of a government decision vis-a-vis a particular piece of property.

### 2.  Discussion

5    Construed liberally, the Conference's regulatory takings claim is predicated on a course of

6    conduct over a period of years that allegedly prevented the Conference from being able to use its

7    property as part of a commercial sale to Pacific Polk in furtherance of its religious mission.  The

8    Conference, however, does not clearly identify which actions on the part of the City caused its

9    takings damages.  Rather, the Conference's FAC alleges generally that the City "intentionally,

10   knowingly, and wrongfully prohibited the Conference from demolishing the Property."  (FAC ¶

11   94.)  In its Opposition, the Conference clarifies that its claim is based on "a continuing ten year

12   course of conduct and including numerous refusals to grant a demolition permit [that] resulted in a

13   taking," and asserts that for this reason, its claim is not barred by the applicable statute of

14   limitations.  (Opp. at 24.)

15   The Conference's "course of conduct" theory, as pleaded in its FAC and as clarified in its

16   briefing, does not sufficiently allege a cognizable legal theory for its regulatory takings cause of

17   action for two reasons.  First, generally, as-applied regulatory takings claims are linked to discrete

18   governmental conduct or action, not years-long courses of conduct.  *See* 998 F.3d at 686.  Second,

19   the practical consequences of the Conference's theory render it implausible, particularly given the

20   lack of argument or factual allegations to support equitable tolling.  The notion that a course of

21   conduct, where, as here, such course is comprised necessarily of discrete agency actions taken

22   throughout a defined period, could form the basis for a regulatory takings claim works an end run

23   around statutes of limitations.[9]  Notably, though the Conference clarifies its "course of conduct"

25   ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

[9] The Court notes that in the California land use context, statutes of limitations play an
important role.  The Supreme Court of California noted in *Hensler v. City of Glendale* that:

The purpose of statutes and rules which require that attacks on land
use decisions be brought by petitions for administrative mandamus,
and create relatively short limitation periods for those actions, and
actions which challenge the validity of land use statutes, regulations,

United States District Court
Northern District of California

theory in its briefing, it does not identify any case to support this legal theory, or any case that can support tolling statutes of limitations in this context.  Nor do the factual allegations provided in the Conference's FAC support an inference that tolling would be proper in this case.

Accordingly, the Conference's factual allegations are insufficient to support its claim of regulatory takings under a generalized ten year "course of conduct" theory, and this claim is therefore **DISMISSED**.  Given the history of this case and the nature of the Conference's allegations, the Court is doubtful that the Conference can plead a factual basis sufficient to support a claim of regulatory takings.  Nevertheless, the Conference shall have leave to file a motion to amend this claim in order to specify what, if any, decision on the part of the City constituted a regulatory taking.

---

and/or decisions, is to permit and promote sound fiscal planning by state and local governmental entities.  As the Court of Appeal explained in *Patrick Media Group, Inc. v. California Coastal Com., supra,* 9 Cal.App.4th 592, 612, 11 Cal.Rptr.2d 824:

> "The requirement that challenges to administrative actions constituting takings be brought initially by administrative mandamus assures that the administrative agency will have the alternative of changing a decision for which compensation might be required.  If no such early opportunity were given, and instead, persons were permitted to stand by in the face of administrative actions alleged to be injurious or confiscatory, and three or five years later, claim monetary compensation on the theory that the administrative action resulted in a taking for public use, meaningful governmental fiscal planning would become impossible."

*Hensler v. City of Glendale,* 8 Cal. 4th 1, 27-28 (Cal. 1994), *as modified on denial of reh'g.*  The Supreme Court of California further observed that "if an owner were permitted to [. . .] delay initiating an inverse condemnation action for almost five years, '[i]n given cases and certainly in the aggregate, the financial burden on the state could be overwhelming.'"  *Id.* at 28 (quoting *California Coastal Com. v. Superior Court (Ham),* 210 Cal.App.3d 1488, 1496 (1989)).

United States District Court
Northern District of California

1

**IV.    CONCLUSION**

For the reasons stated above, the Conference's RLUIPA claim is **DISMISSED** and the City's motion to dismiss this claim is **GRANTED**.  The City's motion to dismiss the Conference's First Amendment claim is **DENIED**.  The Conference's regulatory takings claim is **DISMISSED** with leave to amend.

Within 21 days of the date of this Order, the Conference shall file either (1) a Second Amended Complaint ("SAC") that eliminates the RLUIPA claim and amends its regulatory takings claim to identify with specificity the precise actions upon which this claim is based, or (2) a notice indicating that it will not amend the complaint any further.  Within 28 days of the date of the Conference's filing, the City shall either (1) file an answer as to the sole remaining claim, or (2) if a SAC is filed, file a response.  However, the Court will not entertain any argument on an issue addressed herein.  The sole claim that may require additional motion practice is the Conference's regulatory takings claim.

This terminates Docket Number 161.

**IT IS SO ORDERED.**

Dated:  November 24, 2014

_____
**YVONNE GONZALEZ ROGERS**
**UNITED STATES DISTRICT COURT**

United States District Court
Northern District of California

25